H. LAWRENCE KAUFMAN and JOAN B. KAUFMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kaufman v. Commissioner
Docket Nos. 14558-84; 4038-85.
United States Tax Court
T.C. Memo 1987-350; 1987 Tax Ct. Memo LEXIS 350; 53 T.C.M. (CCH) 1348; T.C.M. (RIA) 87350; July 21, 1987
*350 Harvey R. Poe and Brian D. Loreti, for the petitioners. John M. Elias, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION *351 PARR, Judge: Respondent determined deficiencies in petitioners' Federal income tax in the following amounts for the following years: Year
Deficiency
December 31, 1977
$ 26,960.00
December 31, 1978
12,326.00
December 31, 1979
27,195.00
December 31, 1980
54,897.00
The issues for decision are whether petitioners should be considered the owners for Federal tax purposes of a 50-percent interest in certain IBM computer equipment ("the equipment"), [1] whether notes signed by petitioner [2] may be considered in determining *352 tax deductions resulting from investment in the equipment, whether deductions relating to the investment are limited by either sections 183 [3] or 465, whether petitioners' investment in the equipment gave rise to a substantial underpayment of tax attributable to a tax-motivated transaction within the meaning of section 6621(c), [4] and whether petitioners are entitled to charitable contribution deductions in either 1979 or 1980 in excess of the price petitioner paid for certain contributed property. *353 FINDINGS OF FACT To the extent the facts have been stipulated, we so find them. Petitioners H. Lawrence Kaufman and Joan B. Kaufman resided in Scarsdale, N.Y., at the filing of their petitions. [5] Petitioners timely filed tax returns for all the years in issue with the Brookhaven Service Center in New York. On those returns, petitioners claimed income and deductions relating to the computer investment described below. On their 1979 and 1980 returns, petitioners also claimed the disputed charitable contribution deductions. The Computer Equipment Leasing Transaction
Between December 15 and December 18, 1975, the Levin Computer Corporation ("LCC"), [6] purchased the equipment from IBM. Because LCC bought the equipment as an undisclosed principal through its agent, Stokely-Van Camp, Inc. ("Stokely"), LCC was able to use Stokely's rental credits (accumulated during Stokely's prior period of lease directly from IBM) against the purchase *354 price. [7] Thus, LCC's price was $ 657,169. IBM's list price for the equipment was $ 868,870, approximately twice what petitioners paid for a 50-percent interest in the equipment. We find the amount petitioners paid represented fair market. IBM was paid with two checks, one from LCC and one from Empire National Bank ("Empire"), representing the proceeds of a $ 630,000 loan to LCC. The loan was to be repaid in 84 monthly installments of $ 7,500 plus interest on the declining balance and was secured by the equipment and all payments under the lease described below. Pursuant to an Agreement for IBM Machines ("the lease") dated as of December 15, 1975, LCC leased the equipment to Stokely. The lease was a net lease which required Stokely to pay any taxes and provide coverage under an IBM maintenance agreement. Stokely was responsible for all risks of direct physical loss or damage to the equipment up to the residual value of the machines as shown in Attachment B to the agreement. [8]
*355 LCC charged Stokely $ 9,995 per month for the equipment. Stokely guaranteed to LCC the rent payments, to the extent of the residual value of the equipment as set forth in Attachment B. In the event that Stokely terminated the agreement prior to the 84th month of the lease, however, LCC agreed to use its best efforts to re-lease the machine or obtain offers for its purchase. Funds thus recouped were to be applied first against Stokely's obligation under the termination clause. LCC agreed that, without the consent and direction of Stokely, it would accept no purchase offer less than the residual value of the equipment as set out in Schedule B or a net lease rate of less than $ 9,995. The agreement was not terminable by Stokely before the 36th monthly anniversary of the effective date of the lease (i.e., the installation date of the equipment). Between the 36th and 84th month, Stokely could terminate, subject to the payments described above. The lease would terminate automatically on the 84th anniversary, unless extended by Stokely. Petitioner signed a letter agreement dated as of December 29, 1975, pursuant to which he purchased from LCC a 50-percent interest in the equipment. *356 Although petitioner knew the cost to LCC, he purchased his 50-percent interest in the equipment for $ 419,368.50 payable by the issuance to LCC of three promissory notes. Note 1 was payable in the principal amount of $ 291,868.50 at 11 percent per annum to be paid in the 84 monthly installments of $ 4,997.50 from December 31, 1975. Note 2 was payable in the principal amount of $ 65,000 at 9 percent per annum to be paid $ 30,000 at the time of the making of the note (i.e., December 29, 1975) and $ 36,575, constituting principal and accrued interest, on June 30, 1976. Note 3 was payable in the principal amount of $ 62,500 at 9 percent per annum to be paid in monthly installments of $ 757.30 from January 3, 1977 to December 3, 1988. All three notes were nonrecourse against petitioner, his administrators, successors or assigns. Under their terms, petitioner could, but was not obligated to, discharge LCC's obligation to Empire upon LCC's default, and thereby reduce or eliminate his own obligation to LCC. The notes were secured by the equipment and the equipment lease payments. A pro rata portion of the lease payments had been assigned to petitioner but such assignment was subsidiary *357 to the assignment of lease payments LCC had granted to Empire. Petitioner and LCC executed a management agreement, dated as of December 29, 1975, under which LCC had the obligation to perform all of the bookkeeping functions by which petitioner's notes to LCC would be amortized. LCC was also to pay currently other holders of security in the equipment such as Empire. LCC was granted the sole and exclusive right to manage the equipment, including the right to sign contracts or other instruments in its own name on behalf of petitioner as an undisclosed principal. LCC agreed to manage the equipment exercising all rights consistent with ownership but subject to certain limitations, including inability to do any act that could impose any cost, obligation or charge for which petitioner was personally liable. LCC agreed to hold petitioner harmless from any New York State sales or income tax related to the property or income therefrom. LCC had the right to market, remarket, sell or otherwise dispose of the equipment, and was responsible for any and all costs reasonably required in connection therewith. Petitioner retained the right to object to any proposed lease, sale or other disposition *358 within 10 days of receiving notice of the terms of the proposed transaction, which notice was required. The term of the management agreement was 13 years from the time of its execution and delivery. In consideration of its obligations under the management agreement, LCC received fees as follows: Period
Fee
Through Dec. 31, 1982
- 50% x rentals in excess of $ 9,995 a month
1983 - 1985
- 50% x rentals in excess of 50% x $ 9,155.50 a
month
1986 - Termination of
- 50% x rentals in excess of 50% x $ 6,409 a month
Management Agreement
In the event that the equipment was sold, LCC was entitled to a management fee equal to 50 percent of the total sales revenues, net of all costs and expenses including payments necessary to discharge petitioner's liabilities to LCC. LCC could not look to petitioner personally for payments of any management fees, only to lease or sale proceeds. Petitioner was first interested in the proposed transaction by Lawrence Orloff, his attorney. Orloff, a corporate lawyer, also represented Howard Levin, president of LCC. Orloff passed on petitioner's interest to LCC which sent petitioner a "terms sheet," explaining *359 the economics and tax benefits of the transaction. The terms sheet is appended to this opinion as Appendix A. [9]
Petitioner discussed the terms sheet with his accountant, Charles Maeder. Maeder has represented the Kaufmans since approximately 1973, performing both personal and business services for them. Kaufman regularly discussed his investment opportunities with Maeder, investigating both economic opportunity and tax benefits represented by any particular investment. Petitioner was offered several investments through 1975 including a cattle raising venture and movie and audio recording ventures. The other investments were shunned because they could not as assuredly generate economic profit. With respect to the LCC transaction, Maeder and Kaufman discussed the longevity of the lease, the rental rates, residual value, cash flow and tax consequences. The conversations lasted over several hours. *360 The investment was attractive to Maeder because the equipment was already in place with a reputable company. This led him to believe that the rental income was accurate and the profits would be realized as stated. Maeder pointed out that there was substantial cash flow available to Kaufman, provided in the early years by tax savings and in the later years by rental income. Maeder used an $ 80,000 residual value assumption in his economic profit analysis, explaining only that he thought it was reasonable for $ 800,000 worth of computer equipment and that the figure might have come from Levin. His analysis ran through 1987 or 1988 and assumed lease rental income through that time. He accepted the terms sheet as reasonable in that regard. Maeder was bothered by the fact that it was not until after the principal term of the original lease that petitioners would realize an economic profit, and so spent a good deal of time discussing the potential for rental income. Maeder had no expertise in equipment leasing transactions in 1975. Petitioner had expertise in equipment leasing through the lease of tankwagons to Shell Oil Company of Puerto Rico, and other companies. He began these *361 leasing activities in 1970 or 1971. They proved very profitable for him, but the arrangements were stopped suddenly by the other parties. In the late 1960's, petitioner contacted IBM, NCR and Burroughs to purchase a computer for personal needs. Eventually he decided to computerize his trucking business, and to further these plans went to an IBM school in Endicott, New York in 1969. Petitioner learned there and elsewhere that initial computerization as well as changing from one system to another was costly and laborious. Moreover, he assumed that the equipment at issue here was state-of-the-art at the time the investment was made. He therefore inferred in 1975 that equipment valued at $ 1.6 million [10] would not soon be replaced by its end user. Petitioner was favorably impressed with Levin's reputation. On the basis of all the above, he concluded that his LCC investment was economically sound. *362 Levin was involved in computer leasing since at least 1963. In that year, he formed the predecessor of Levin Townsend Computer Corporation ("LTC"). LTC was an American Stock Exchange computer leasing corporation with assets of approximately $ 300 million dollars and net worth of approximately $ 80 million dollars. Eventually, Levin became the president of LCC. Levin projected in the terms sheet sent to petitioner that lease income through 1982 would be $ 9,995 a month. This was the agreed Stokely rent. The terms sheet projected lease income of $ 9,032 a month for 1983-1985 inclusive, and $ 6,322.42 a month for 1986 and 1987. Levin projected lease income based in part on his experience with the previous generation of IBM machines, the Systems 360. The IBM 360/40 was the machine of the proceeding generation closest in characteristics and performance to the IBM 370/145 or 3145, at issue here. The IBM 360/40 was introduced in July of 1964. Levin testified that as of 1975 IBM 360 computers were still being leased for periods running from three to eight years. As evidence, petitioners introduced a letter, dated September 19, 1975, written to LCC from Edward V. O'Connor, the *363 contracting officer for the United States Coast Guard Division of the U.S. Department of Transportation. The Coast Guard sought to purchase an IBM System 360 computer for use over a 10 year period. This indicated to Levin that as of 1975 the System 360 computers could be expected to have a total economic useful life of approximately 19 years. Levin anticipated that even if larger lessees sought new machines, what he called secondary and tertiary users with less economic strength would lease on a short term basis. Because of this he anticipated that the useful life of the computer equipment would be between 15 and 20 years. Levin also relied for his projections on a letter dated November 19, 1973, from Frederick Withington of The Arthur D. Little, Inc. ("Little") consulting firm. Little is a well known firm, and we have looked to appraisals done by Withington in prior computer leasing cases. [11] Withington indicated that as of 1973, nine years after their introduction, Systems 360 retained a residual value of approximately 40 percent of their original value. Their residual value was projected to decrease to about 10 percent in 1980, sixteen years after introduction. Some transactions *364 in the 10 to 15 percent range were projected to occur even beyond 1980.
In his letter, Withington also discussed residual value of System 370 models, including the 3145. The IBM 3145 was introduced in September 1970 with initial deliveries occurring in July of 1971. Thinning of the market for IBM 3145s was said by Withington not to be a problem before 1985, fifteen years after their introduction. The computers' potential for reconfiguration was cited as one reason the 3145s might retain substantial value through the 1980's. Withington opined that there should be no trouble finding buyers for the machines as late as 1985, when residual value was projected to be in the range of 10 to 15 percent. Moreover, lessors offering customers short term leases for either System 360 or 370 models were said to be able to demand premiums. Petitioners treated their *365 investment as follows on their tax returns for the years in issue: Deductions
Rental
Profit
Year
Depreciation
Interest
Income
(Loss)
1977
$ 74,858
$ 31,617
$ 59,970
($ 46,505)
1978
52,400
31,152
59,970
(  23,582)
1979
61,133
24,232
59,970
(  25,395)
1980
61,134
19,107
59,970
(  20,271)
It appears that petitioners did not follow the depreciation schedule reflected in the terms sheet and so did not begin to realize "phantom" income in 1980, as was projected. Petitioners did, however, report substantial income from their investment in 1981-1984. The Charitable Contribution
Martin Rosen, principal of M.W.R. Construction Company ("MWR"), a masonry contracting concern, had been in the construction business for all of MWR's corporate existence. Established in 1946, MWR began corporate dissolution around 1979. Certain of MWR's assets were housed in 15,000 square feet of warehouse space, subdivided into two buildings of 7,500 square feet each. In the course of MWR's dissolution Rosen sold the warehouse space. Pursuant to such sale the assets stored in the warehouse were *366 to be removed by MWR within 18 months. During the course of the dissolution, Rosen sold substantially all the equipment stored in one warehouse. It took him three to four months to do so, during which time he employed up to eight unionized laborers at a cost of approximately $ 16 an hour, plus benefits for each. Rosen sold the equipment to various contractors on an item-by-item basis. He sought to sell all the equipment in the first warehouse before he made any substantial effort to sell any equipment in the second. Rosen realized that he was losing money on the sale of the construction equipment and, in November 1978, petitioner agreed to purchase from MWR in bulk the entire contents of the second warehouse. He paid $ 20,000 for this equipment by promissory note dated November 10, 1978 and due April 10, 1980, accruing interest at 9 percent a year. In addition, a storage fee of $ 180 per month was to be charged petitioner until removed of the equipment. On April 9, 1980, Kaufman paid MWR $ 25,040 in discharge of principal, interest and storage fees. Petitioner, who was in the chemical trading business, bought the equipment with an eye to its resale at a profit. The most *367 common market for the equipment would be contractors such as Rosen's customers. Rosen told petitioner that he was getting "a hell of a bargain" for his $ 20,000, but removal of the equipment from the premises at petitioners' expense was a condition of purchase. Neither Rosen nor petitioner prepared an inventory of the equipment nor did petitioner receive a list of the equipment prior to purchase. Petitioner had business interests in the Dominican Republic during 1979. Late in that year Hurricane David struck the Dominican Republic and caused considerable damage. Following this natural disaster, it occurred to petitioner that construction materials might be useful there. He therefore contacted the Pan American Development Corporation ("PADF"), a charitable organization [12] recommended to him by the Dominican Consulate in New York, in an effort to provide the equipment he purchased from MWR for the benefit of the Dominican people. Petitioner had not attempted to sell the equipment to that point, or at any point thereafter. After petitioner *368 contacted PADF, the charity sent a representative to the warehouse. After examination by the charity, petitioner arranged for transportation of the equipment to a prior, but the ocean freight charges were paid by PADF. PADF submitted to the Agency for International Development of the U.S. Department of State vouchers for reimbursement of ocean freight charges paid by it for transportation of the equipment to the Dominican Republic. Those vouchers refer to bills of lading dated December 26, 1979 and December 12, 1979. There is only one bill of lading in the record and it is punchdated December 26, 1979. The freight forwarder's invoices for those amounts are dated January 2, 1980. Petitioner testified that the equipment was taken to the piers in December of 1979. We find the equipment was delivered to PADF in 1979. The loading and transport process took approximately two weeks. Petitioner hired labor from the unemployment rolls and used other labor he had on hand to complete the job which required the use of six 40-foot long trailers. In addition, a separate truck was needed to transport a donated forklift and two other contributed trucks were driven under their own power *369 to the pier. These latter trucks were a 1975 5-ton Ford with a hydraulic tailgate and a 1965 Mack dumptruck. The forklift was the heaviest Yale forklift made in 1969, and cost $ 16,000. The Ford truck cost $ 26,000. In addition, there were around 1,300 brand new 2 X 12 wooden planks, unused insulation, motor driven mixers, hoists, engines and saws, and all manner of masonry construction material and equipment. The only itemization of the equipment was done by a representative of PADF drawing manifests as it was being loaded at the pier. The manifests were written by PADF, given to petitioner to be typed, and returned to PADF. After shipment of the equipment, PADF asked petitioner to value the equipment. Realizing that appraisal of equipment already shipped could only be done by one familiar with the equipment, Petitioner asked Rosen to do the job. Early in 1980 Rosen asked a secretary to consult MWR's purchase books and purchase orders for all the equipment on the manifest lists. He asked her to put the values from the purchase orders and purchase books on the list as the value of the relevant equipment and then consult with him. If Rosen determined that the equipment *370 was new he left the cost figure alone. If he determined that it was used he put a percentage discount on the equipment according to what he though it was worth. With very few exceptions, the record does not reveal which items were used and which unused. The appraisal Rosen gave was dated Feb. 1, 1979, and totalled $ 126,358. [13]
In a letter dated February 5, 1980, Peter N. Stevens, Executive Director of the Tools for Training Program of PADF stated that the organization looked forward to receiving an additional appraisal by another third party as soon as possible. Petitioner approached Rosen regarding the second appraisal, and Rosen recommended Morton Lewanda, a former purchasing employee at MWR. Lewanda never appraised equipment prior to or since his appraisal for Rosen. His appraisal came to a total of $ 135,087. Petitioner listed on his tax return for 1979 the average of the Rosen and Lewanda appraisals, i.e., $ 130,700, as the fair market value of the equipment at the time of the contribution. Petitioner deducted $ 26,896 on his 1979 tax return and carried *371 over $ 60,404 to his 1980 return. OPINION The Computer Equipment Leasing Transaction
Respondent attacks the transaction here with a battery of weapons. He argues petitioners did not own the equipment, either because the price they paid exceeded the property's fair market value or because they were without the benefits and burdens of ownership; that the transaction lacked economic substance both because there was no reasonable prospect of profit and because petitioners had no business purpose to their investment; that the notes petitioners signed cannot support the claimed deductions and should be disregarded; and that, if we do not find for respondent on any of the above theories, petitioner's deductions are limited by both sections 183 and 465. Respondent also seeks increased interest under section 6621(c). Respondent urges us to find that petitioners paid an amount so in excess of the equipment's fair market value that on this basis alone we should void the transaction for Federal tax purposes under Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). We simply are unable to conclude that petitioners' *372 payment to LCC of an amount less than 50-percent of IBM's list price for a 50-percent interest in the equipment is payment of an amount so unrelated to the fair market value of the equipment that we should disregard the transaction. This is especially so where LCC used credits to make its purchase which were probably unavailable to petitioners. Also, respondent argues that petitioner was without the benefits and burdens of ownership of the equipment. Respondent cities in support of his position Sun Oil Co. v. United States,562 F.2d 258 (3d Cir. 1977), revg. a Memorandum Opinion of this Court, cert. denied 436 U.S. 944 (1978), and Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). In Sun Oil, the seller/lessee of real property in a sale leaseback transaction was deemed to be the true owner of the property and its deductions for rental payments were denied. Respondent states: "The arrangement between Kaufman and LCC in this situation is virtually identical to that between the lessee and lessor in Sun Oil * * *." Although respondent has pointed to some similarities between the cases, we think the differences *373 are more substantial. First, it requires a bit of a stretch to fit this case into the Sun Oil facts, because LCC, the party to which respondent would attach the benefits and burdens of ownership, was not a lessee. Even putting LCC in that position, however, there is no evidence that it could repossess the property at will, as was the case in Sun Oil. There is no evidence that the buyer (here, petitioner) could be deprived of the property for nominal amounts above its predetermined investment return, as was the case in Sun Oil. Moreover, there is no evidence here that at the time the transaction was entered into, the buyer knew it would realize quarterly returns on its investment equivalent to market interest rates, without regard to the fair market rental value of the property, as was the case in Sun Oil.
We likewise cannot agree that Grodt & McKay Realty, Inc. v. Commissioner, supra, warrants a holding for respondent. Of the relevant Grodt & McKay factors respondent points to as helpful in determining whether a sale took place here, only one clearly falls on respondent's side of the argument. This is the payment of property taxes by LCC. *374 However, the location of legal title, the characterization of the transaction by the parties, the allocation of profits, whether the lessor acquired an equity in the property, whether present obligations to perform were imposed on the parties, and whether petitioner had a right of possession all are factors which either warrant a holding for petitioner or are neutral. We decline to conclude that there was no sale for Federal tax purposes. Respondent next argues that the transactions cannot be respected for Federal tax purposes under Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and remanded in part 752 F.2d 89 (4th Cir. 1985). Under Rice's Toyota, the transaction will be disregarded if there was neithera reasonable opportunity for economic profit nor a business purpose to petitioner's investment. We think there was a reasonable opportunity for economic profit here, and so reject this argument. S. Paul Blumenthal of the American Technology Appraisal Service ("ATAS") testified as an expert for respondent. He stated that at the time of petitioner's purchase the fair market value of their 50 percent interest in *375 the equipment was $ 295,416. This represents a 32 percent discount off the IBM list price as of December 19, 1975, a greater discount than LCC received through use of Stokley's rental credits. Blumenthal projected that as of December 1975, the December 1982 value of the equipment could be expected to be $ 43,444 or 5 percent of its December 1975 list price. Petitioners' 50 percent interest in the equipment would thus have a December 1982 value of $ 21,722. Blumenthal based his determination on the following. Used IBM 3145 computers first began selling in 1975. At that time, the equipment was trading at approximately 68 percent of the IBM list price. Discounting that value by annual amounts ranging from 11 percent in 1976 to 19 percent in 1977 and back down to 4 percent in 1982, a final 1982 value was derived. The 68 percent value was based on a 1975 ATAS analysis of the 3145 and excerpts dated Summer 1975 and Winter 1976 from the Computer Merchants' Computer Price Guide. The Winter 1976 Computer Price Guide excerpt indicates that 3145s were selling for between 67 and 72 percent of their list prices (which list prices ranged from $ 741,420 to $ 1,235,045). The Summer 1975 *376 Computer Price Guide excerpt lists three 3145s trading for between 68 and 72 percent of their list prices (which list prices ranged from $ 769,130 to $ 957,100). We are not informed whether the ATAS study is based on any more than the Computer Price Guide excerpts. Although Blumenthal offered an opinion on fair market value and future residual value, he did not directly address the reasonableness of the terms sheet representations regarding lease income. The parties hotly dispute whether it was reasonable to assume the equipment would still have utility to a potential lessor after 1982. We agree with respondent that as of 1982 the equipment would not have earned (even if sale proceeds were factored in) enough to make the transaction economically profitable for petitioners. However, although this is a close case, we think it reasonable for a 1975 investor to assume that the equipment could have been leased after 1982 for an amount sufficient to earn petitioners some economic profit. The total of the payments due from investors on notes not projected to be amortized by rent payments from Stokely is $ 337,827. We assume, based on the expert testimony, investors had 5 *377 years of rental life after 1982 in which to recoup this amount, less $ 9,995 of Stokely rental income paid to them in 1982, i.e., $ 327,832. Thus, average annual rental income of $ 65,566.40 was required from 1983 through 1987 for petitioners to earn an economic profit. With LCC's management fee the amounts would increase to $ 76,199.80 for 1983-1985 [14] and $ 92,678.80 in 1986-1987. [15] We think average annual rentals of $ 82,791.40 could reasonably be assumed by 1975 investors. [16] Moreover, after the 50 percent sale fee is paid to LCC, the ultimate residual sale price of the equipment is to be directed to the investors. We therefore hold petitioner had a reasonable opportunity for economic profit. [17] We next turn to respondent's arguments regarding the notes petitioner signed. *378 STThe repayment of Note 1 was dependent upon the receipts from the Stokely lease. Although this lease was "terminable" after 3 years, in the event of termination Stokely was obligated to pay the "residual value" of the equipment as set out in a schedule attached to the lease. Even though the schedule provided for payment of amounts slightly less than required to pay off Note 1, it provided for amounts approximately equal to those necessary to cover LCC's obligation under the Empire note and in any event was sufficient to cover the lion's share of the investor's note payments. For example, three years after the term began, Stokely would have to pay $ 386,721 on termination of the lease. The investors' remaining obligation on Note I was $ 479,780, including interest. LCC's remaining obligation on the Empire Note was $ 360,000 plus interest, if any. Respondent has not challenged the bona fides of either the Stokely lease or the Empire note. The terms of the Stokely lease insure the availability of most of the funds to pay Note 1. Respondent alleges that petitioner's lack of equity in the equipment makes the notes economic nullities and that Note 3 is too contingent to be recognized *379 for Federal tax purposes. We reject these arguments. Notes 2 and 3 were to be paid out of petitioner's pocket. He paid $ 30,000 on Note 2 at the time of the investment. He paid the balance of Note 2 but six months later. He paid fair market value for the equipment. He must be regarded as its owner for Federal tax purposes under Sun Oil Co. v. Commissioner, supra and Grodt & McKay Realty, Inc. v. Commissioner, supra.Therefore, we reject the argument that petitioner's lack of equity in the equipment makes the notes economic nullities. We now turn to respondent's contingency argument. In Estate of Baron v. Commissioner,798 F.2d 65 (2d Cir. 1986), affg. 83 T.C. 542 (1984), the Second Circuit discussed the circumstances under which a note may be disregarded for contingency. Such circumstances may be present where the amount of the debt unreasonably exceeds the fair market value of the underlying collateral or because that value was too uncertain. Estate of Baron v. Commissioner, supra at 68-69. Our prior discussions *380 of fair market value and economic profit show neither circumstance to be present here. Moreover, respondent has not disputed that petitioners actually made payments on Note 3 in each year in issue, years in which they had no cash flow from the lease with which to make those payments. We reject respondent's argument that the notes should be disregarded. Respondent next argues that, if we do not disallow petitioner's tax benefits on any of the above grounds, they are limited by section 183 because petitioner did not engage in this investment activity for profit. Again, we disagree. The issue of whether the requisite profit objective existed is one of fact to be resolved by examination of the surrounding facts and circumstances. Capek v. Commissioner,86 T.C. 14, 37 (1986); Hager v. Commissioner,76 T.C. 759, 784 (1981). In making this determination, the Court will give greater weight to objective facts than mere statements of intent. Surloff v. Commissioner,81 T.C. 210, 233 (1983). The burden of proof is on petitioner to show the *381 existence of a profit objective. Rule 142(a). The facts show a profit motive. First, the sales price was reasonably related to the fair market value of petitioner's interest therein. Second, there was a reasonable opportunity for petitioner to make an economic profit apart from tax benefits. These facts distinguish this case from the typical predominantly tax-motivated transaction. Moreover, petitioner had been involved profitably with equipment leasing in the past, and had some familiarity with computers by the time of his investment in the equipment. He attempted to computerize some personal affairs, had in fact computerized his business, and had attended an IBM school. He knew from experience that state of the art and expensive equipment would probably not readily be replaced, absent special circumstances. He knew LCC had acquired the equipment at a discount. Petitioner was told of LCC by his attorney, Orloff, who also represented Levin. Orloff was a corporate lawyer. It has not been shown that he is a tax advisor or has any particular expertise in tax matters. Levin, who ran LCC, had been engaged in computer leasing for over a decade. LTC, which he formed, was *382 a profitable computer leasing company with $ 300 million in assets and an $ 80 million net worth and whose stock was traded on the American Stock Exchange. Levin sent petitioner a terms sheet which reflected as income up to 1982 (i.e., for most of the life of the investment) rent to be paid by a large and reputable company which already had the equipment on its premises. The lease with Stokely was renewable beyond 1982. The terms sheet projected declining rental income for years after 1982. Petitioner discussed this transaction, as he did other proposed investments, with Maeder, his independent investment advisor and accountant. Petitioner and Maeder had discussed movie and audio recording as well as cattle breeding ventures. These were rejected because they could not generate economic profit as assuredly as the LCC transaction. All these facts show that the activity was engaged in for profit. An analysis of potential tax benefits also shows that petitioner had a profit motive when he invested. Cf. Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). The terms sheet attached as Appendix A to this opinion *383 reveals that for the first five years of the investment, dollars paid in by investors would be more than offset by tax benefits. Total cash paid during those years would be $ 188,971. Total tax losses would be $ 520,444. In the 50 percent tax bracket then, total actual cash profit, including tax benefits, would be $ 71,251. In the sixth year of the investment, however, investors would begin to pay tax on "phantom" rental income under the terms sheet. [18] In that year, 1980, they would pay taxes of $ 5,930, in 1981, of $ 46,574, and in 1982 of $ 52,935. These tax payments total $ 105,439. The deductible tax losses of $ 520,444 in the first five years would thus yield tax benefits to a 50 percent taxpayer of $ 260,222 for net tax benefits during the first eight years of the investment of $ 154,783. Under the terms sheet, however, investors would also make note payments of $ 244,792 in the first eight years, above and beyond those amortized by rent payments. Therefore, even if we terminate our analysis as of 1982, as respondent repeatedly urges, we would find that petitioners' tax *384 benefits would only be some 63 percent of their out of pocket expenditures. When looked at in this light, it cannot be said that the attraction of this transaction was tax benefits. We reject respondent's profit motive argument. We still must decide whether petitioner's deductions are limited under the at risk rules of section 465. We find that section 465 is inapplicable to the instant transaction. Section 465 is inapplicable to equipment leased under a contract binding before January 1, 1976, as long as the taxpayer held his interest before that date. Sec. 204(c)(3), Pub. L. 94-455, 90 Stat. 1533. The lease between Stokely and LCC was entered into "as of" December 15, 1975. Petitioner purchased a 50-percent interest in the equipment pursuant to a letter agreement dated "as of" December 29, 1975. LCC also signed a Bill of Sale on December 29, 1975. We are not advised of the significance of the use of the phrase "as of," but respondent has neither alleged nor introduced proof that any document in evidence was executed on a date other than the one it recites. We therefore accept *385 that the transaction here involved a lease entered into pursuant to a contract binding before January 1, 1976. Petitioner held his interest before that date. Section 465 is inapplicable. We hold for petitioner on the computer equipment leasing transaction issue. We, therefore, deny respondent's request for increased interest under section 6621(c). The Charitable Contribution
A. Value of Contribution
Respondent argues that petitioners' charitable deduction is limited to their cost basis in the construction equipment, i.e., $ 20,000. He recognizes that petitioners are entitled to deduct the fair market value of their contribution, but contends that petitioners have failed to prove that fair market value exceeds petitioners' purchase price, said by respondent to be the best evidence of fair market value. Respondent claims that petitioners' appraisals are insufficient to prove otherwise. Respondent asserts first that Rosen's use of his cost as a starting point for the appraisal is contrary to law. Moreover, Rosen is alleged to have insufficient expertise to perform the appraisal and is characterized as a lay witness whose opinion is not competent evidence. Finally, *386 respondent urges us to take into account Rosen's costs of selling the warehoused equipment as impacting on its fair market value. Petitioners characterize their purchase as a "bargain sale" by MWR to petitioner for resale purposes. The low price was motivated by petitioner's need for profit on resale, by time pressure on Rosen to clear out his warehouse, and by the time, cost and trouble of selling the equipment item-by-item. Petitioners claim both that buyer and seller intended the price to be, and that the price was, well below fair market value. Petitioners rely on the Rosen and Lewanda appraisals to establish fair market value. Petitioners say that Rosen, with 35 years of industry experience and knowledge of the equipment condition, was the only person who could have accurately appraised the equipment sight unseen. His methodology is endorsed because cost is said to be cogent evidence of fair market value. They contend the fact that Lewanda's appraisal was higher, despite his lack of any ties to Rosen or petitioners at the time of the appraisal, supports the reasonableness of petitioners' deduction. Our starting point is *387 section 1.170A-1(c), Income Tax Regs., which provides: (c) Value of a contribution in property. (1) If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution * * *. (2) The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * Although section 170 and the regulations promulgated therefore are silent as to the market to be used in determining the value of donated property, the valuation test for estate and gift tax purposes is generally the same as that used for charitable contribution deduction purposes. United States v. Parker,376 F.2d 402, 408 (5th Cir. 1967); Lio v. Commissioner,85 T.C. 56, 66 (1985). Section 20.2031-1(6), Estate Tax Regs., and section 25.2512-1, Gift Tax Regs., provide that the fair market value of an item is to be *388 determined in the market where such item is "most commonly sold to the public." In Anselmo v. Commissioner,80 T.C. 872 (1983), affd. 757 F.2d 1208 (11th Cir. 1985), a case not cited by either party, we addressed principles we find crucial to the decision herein. There, the taxpayers bought and donated unset gems in bulk, claiming a charitable deduction based on the cumulative value of each individual gem as ultimately finished and sold in a hypothetical piece of jewelry by a retail jeweler. We found that the most relevant market within which to value the unset low quality gems was not that of individuals buying from retail jewelers, but the retail and manufacturing jewelers themselves, since no one further down the distribution chain would purchase the gems in their unmodified state. In this case, petitioner bought the equipment for resale. Respondent has not disputed that MWR sold the contents of the first warehouse to various contractors. We think it a fair inference that the equipment from the second warehouse, without any modification, could have been resold by petitioner to various contractors. We conclude that the appropriate market for *389 valuation of the warehoused equipment is one of contractors seeking second-hand masonry machines, equipment or construction components, [19] and not one of speculators purchasing such material for bulk resale to a single buyer. [20]
In light of the above, we cannot accept respondent's contention that the price *390 petitioner paid for the equipment should be accepted as its fair market value. We have considered the authorities he cites, and they do not compel a different result. Tarit Sarkar testified for respondent as an expert witness with respect to the value of the equipment and vehicles. He did little to help establish or support the $ 20,000 value. He merely stated that absent better evidence, he would look to the price petitioner paid to determine fair market value. Sarkar could not perform an accurate appraisal because of his lack of information about the equipment. He determined that an appraisal would require an inspection of the equipment to determine the condition of the individual items. Sarkar testified that sale of the items in bulk is the more economical way to sell equipment such as that at issue, which he referred to as "junk." He concluded that due to the lack of market for it $ 15,000 or $ 20,000 would be a fair price. Thus, Sarkar would conclude that the price petitioner paid was the fair market value of the equipment. Moreover, Sarkar criticized the symmetry of the Rosen and Lewanda appraisals as inexplicable. Sarkar did, however, address certain specified items *391 listed as part of the equipment donated. He commented that the $ 8,000 figure that Rosen put on the Yale forklift was obviously too high for 10-year old equipment even if purchased for $ 16,000 and that, depending on the condition of the forklift, it would be worth about $ 1,000. Sarkar conceded on cross-examination, however, that the forklift which he valued at $ 1,000 might be worth up to $ 4,000 if it were a large forklift in good condition. He further conceded that although he looked at price lists for used forklifts, he did not look for Yale forklifts because he thought the forklift was a Clark. Sarkar testified that the $ 3,000 value placed on the dump truck by Rosen could be accurate. Sarkar later equivocated however, at first doubting that $ 3,000 could be the price, and then stating that the price would depend on the condition of the item, and then giving a range from zero to $ 1,000. Sarkar based his opinion on the simple statement that construction equipment does not last that long. Sarkar did not consult price lists to check the value of the 1975 Ford truck because he did not know its model year. He determined that it was worth $ 5,000 but could not give a basis *392 for the opinion. We do not accord his opinion much weight. In Anselmo v. Commissioner, supra, we also addressed the issue of bulk sales. We held that, where the taxpayer is not a dealer in the assets donated, a separate fair market value should be determined for each separate "unit of property." Anselmo v. Commissioner,80 T.C. at 883-884. We looked to groupings commonly sold in the relevant market in determining what is a separate "unit of property." We observed that individual gems are often sold to retail jewelers for their incorporation into finished pieces of jewelry, and so concluded that each individual stone was a separate unit of property. Id.
Here, the relevant market is that in which contractors purchase second hand masonry machines, equipment and construction components. We must ask under Anselmo, then, whether such contractors commonly purchase individual or groups of masonry machines, equipment and construction components. The only evidence in the record going to this question is the testimony that goods in the first warehouse *393 are sold "item by item." This testimony simply is an inadequate basis upon which we can decide the question. Although we can infer that something less than the entire contents of the first warehouse was purchased each time a sale was made, we know little more. We can surmise, however, that at least some groups were sold, because certain items, for example wood planks, would not likely be sold individually. And we would not be surprised to learn that contractors often purchased, at second hand sales, more than one group of like assets. For these reasons, we cannot accept that each individual item is a separate unit of property. We also agree with respondent that petitioner's valuation methodology is flawed insofar as it proceeds on the basis of original cost. We find it unlikely that if buyers were willing to pay original cost, they would not go first to vendors in the business of selling the desired goods, where they could shop for the most appropriate item, obtain it in "mint condition," speak to knowledgeable salespersons willing to give their time, and often obtain manufacturer's warranties perhaps otherwise unavailable. It is common knowledge that an item typically depreciates *394 the day it is removed from the retailer. Thus, we should appropriately discount all the items for partial bulk sale potential, and discount again the unused items to adjust for the fact that they would not sell at cost in petitioner's hands. [21] However, even before we assign discount figures, we must determine to what the figures should apply. Without knowing exactly which of the items were used and which unused, our task is difficult, and will involve some speculation. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). *395 In Anselmo v. Commissioner, supra, we accepted the value determined in the notice of deficiency where we rejected both parties' experts. Here, however, to reject respondent's expert testimony is to reject the very value determined in the notice of deficiency. [22] Moreover we do not reject Rosen's valuation.[23] To the contrary, we accept it generally, but find it in need of adjustment. [24]
*396 Nor do we accept respondent's argument that we must look to Rosen's actual sale of the same property within a short period of time before the donation to determine value, as we did in Chiu v. Commissioner,84 T.C. 722 (1985). We have already discussed why Rosen's sale to petitioner was not a sale in the relevant market. Moreover, our opinion in Chiu provides ample support for our decision today, telling us, as it does, to weight opinion evidence "in light of the demonstrated qualifications of the expert and all other evidence of value," and to use our "best judgment" in embracing or rejecting such testimony. Chiu v. Commissioner, supra at 734. Respondent's reliance on Lio v. Commissioner,85 T.C. 56 (1985), is likewise misplaced. In Lio, we looked to the taxpayer's purchase prices for indicia of fair market value. Again, however, the critical distinction between Lio and this case is that there, we viewed the market in which the taxpayers made their purchases as the relevant market. Lio v. Commissioner, supra at 68-71. *397 We are thus brought to the difficult task of determining value. Since we accepted Rosen's valuation testimony as the most probative, we use it as a starting point. We determined, however, that his appraisal requires judgment in two respects. First, because each individual item cannot be deemed a "separate unit of property," we adjust the appraisal to account for partial bulk sales. Second, because the property would sell for less than Rosen's cost if sold by petitioner without warranties or other benefits, we discount Rosen's appraisal of the unused assets. The latter adjustment is not applied to the used assets. See n. 21, above. We must, therefore, determine what portion of the assets are unused. These alone will be subject to the second discount. We know that 10 percent of the items determined by value [25] consisted of the 1300 brand new planks. Bearing heavily against petitioners, who have the burden of proof, we determined that another 40 percent, by value, of all the items, should be deemed unused for a total of 50 percent. [26] Using our best judgment, the discount to be applied to the equipment deemed unused (with a value of $ 63,179) should be 30 percent for a *398 total initial discount of $ 18,953,70. Thus, before we apply a discount for bulk sales, the property has a value of $ 107,404.30. Again using our best judgment, we determine that the discount a partial bulk purchaser in the relevant market, i.e., another contractor, would bargain for is 40 percent. We thus discount $ 107,404.03 by $ 42,961.72 and arrive at a value for the property of $ 64,442.58
B. Year of Contribution
Section 1.170A-1(b) provides, in pertinent part: (b) Time of making contribution. *399 Ordinarily, a contribution is made at the time delivery is effected. * * * We have recognized that delivery to either the done or an agent may be sufficient to fulfill the delivery requirement. Skripak v. Commissioner,84 T.C. 285, 318 (1985); Greer v. Commissioner,70 T.C. 294, 304 (1978), affd. on other issues 634 F.2d 1044 (6th Cir. 1980). "The crucial question in such a case is whether the donor has effectively parted with dominion and control over the subject matter of the gift." Skripak v. Commissioner, supra at 318. Although Rosen thought the equipment was removed from his premises in 1980, petitioner was certain he delivered the equipment for shipment in December of 1979. Both bills of lading relating to the ocean shipment of the goods were dated December 1979. The freight forwarder's invoices were dated only two days into January of 1980. In light of the testimony, the dates of the bills of lading, and the date on which the freight forwarder billed PADF for its services, we conclude that the property was delivered to PADF, or its agent at the piers *400 in New York, in 1979. The charitable deduction is allowable in that year. In accordance with the foregoing, Decision will be entered for petitioners in docket No. 14558-84.
Decision will be entered under Rule 155 in docket No. 4038-85.
APPENDIX A SALE OF IBM 370 TYPE 3145 OF PROCESSING UNIT LEASED TO STOKELY VAN-CAMP, INC.
1975
1976
1977
1978
1979
1980
Rental Income
$  9,995 119,940 119,940 119,940 119,940 119,940 Depreciation
125,811 213,878 149,715 139,733 139,733 69,867 Interest-Note 1
5,351 60,776 53,930 46,291 37,769 28,260 Note 2
3,150 Note 3
11,994 11,373 10,695 9,953 Profit (Loss)
(121,167)
(157,864)
(95,699)
(77,457)
68,257)
11,860 Cash Payment
by Investor:
Principal
payment
60,000 Principal +
interest on
Note 2
73,150 Principal + interest on
18,607 18,607 18,607 18,607 Note 3
Cash Payment
to Investor
Net Cash to
Investor at
50% tax rate
583 5,782 29,243 20,122 15,552 (24,537)
Investor Cash
in transaction
at 50% tax rate
(583)
(6,365)
(35,608)
(55,730)
(71,252)
(46,715)
*401 1981
1982
1983
1984
1985
1986
1987
Rental Income
119,940 119,940 108,384
108,384
108,384 75,869 75,869 Depreciation
Interest-Note 1
17,651 5,815 Note 2
Note 3
9,141 8,254 7,282
6,220
5,058 3,787 2,397 Profit (Loss)
93,148 105,871 101,101
102,164
103,326 72,082 73,472 Cash Payment
by Investor:
Principal
payment
Principal +
interest on
Note 2
Principal +
interest on
18,607 18,607 18,607
18,607
18,607 18,607 18,607 Note 3
Cash Payment
to Investor
9,995 108,384
108,384
108,384 75,869 75,869 Net Cash to
Investor at
50% tax rate
(65,181)
(61,548)
39,227
38,695
38,114 21,221 20,526 Investor Cash
in transaction
at 50% tax rate
18,466 80,014 40,787
2,092
(36,022)
(57,243)
(77,769)
This document is for information only and makes no representation as to tax or economic consequences. A prospective Investor should consult his own tax advisor. LCC rate through December 31, 1982 is 55.3% of IBM Monthly Available Charges. For 1983 through 1985, it *402 is assumed at 50% of IBM MAC, for 1986 through 1988 at 35% of IBM MAC. Footnotes
1. The equipment was identified in the Bill of Sale to petitioners as follows: Description
Type-Serial Number
Central processing unit ("CPU")
3145 10261
Console printer
3215 10600
Power unit
3047 90747
Certain additional features for the CPU were also part of the package. ↩
2. For convenience, petitioner H. Lawrence Kaufman will be referred to as petitioner herein. ↩
3. Unless otherwise noted, all section references are to the Internal Revenue Code as in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. Sec. 6621(d) was redesignated as sec. 6621(c)↩ by sec. 1511(c)(1)(A) of Pub. L. 99-514 (1986). We use the reference to the Internal Revenue Code as thus amended. 5. Separate notices of deficiency were issued for the years before and after December 31 1978. Two petitions were therefore filed. By our order dated December 20, 1985, the two dockets were consolidated for trial, briefing and opinion. ↩
6. LCC is now known as the Levin International Corporation. ↩
7. For that same reason, LCC's name is absent from the IBM sale documents. ↩
8. Attachment B, as amended, provides in pertinent part as follows: Monthly Anniversary
Residual Values
Residual Values *
Date at Termination
in Dollars
as a % of Purchase Price
0
$ 657,169
100.00
12
525,111
79.90
24
459,700
69.95
36
386,721
58.85
48
305,296
46.46
60
214,449
32.63
72
113,089
17.21
84
-0-
-0-
* Residual Value Gurantees for dates other than those specified will be interpolated from the above table. ↩
9. Appendix A to our opinion is a revised term sheet sent to petitioner less than a month after the investment date. Since the revised sheet altered the original so as to more closely conform it to the actual terms of the transaction, we look to it for purposes of this opinion. ↩
10. Petitioner was under the impression that the equipment's price was $ 1.6 million, and that Levin was able to buy at a deep discount. Whether this was a misapprehension of the actual discount Levin got by using Stokely's rental credits, a misapprehension of the 1975 price of a machine that might have listed for $ 1.6 million when first introduced in 1970, or some other misapprehension, we are not told. ↩
11. See Bussing v. Commissioner,88 T.C. 449 (1987); Gefen v. Commissioner,87 T.C. 1472 (1986); Mukerji v. Commissioner,87 T.C. 926 (1986); Estate of Thomas v. Commissioner, T.C. 412 (1985). See also Johnson v. United States,11 Cl.Ct. 17↩ (1986)
12. Respondent does not challenge the status of PADF as a donee eligible to receive contributions deductible from tax under sec. 170↩. 13. Rosen testified that the correct date was 1980. He erroneously thought the equipment was removed in 1980. ↩
14. For 1983-1985, LCC's fee was 50 percent of all rentals in excess of $ 54,933. Deducting 50 percent of the rentals between $ 54,933 and $76,199.80 would leave $ 65,566.40 from which investors would recoup their investment. ↩
15. For 1986-1987, LCC's fee was 50 percent of all rentals in excess of $ 38,454. Deducting 50 percent of the rentals between $ 38,454 and $92,678.80 would leave $ 65,566.40 from which investors would recoup their investment. ↩
16. 76,199.80 x 3 = 228,599.40
92,678.80 x 2 = 185,257.60 / 413,957 divided by 5 = 82,791.40 We are aware use of averages skews the results because of the management fee. This average, however, is used only for illustrative purposes. Our result is unchanged under the nonaveraged figures. ↩
17. As long as economic profit potential has been shown, it is not for us to determine whether a taxpayer could have done better in another investment. See Estate of Thomas v. Commissioner,84 T.C. 405, 440↩ n. 52 (1985). 18. Petitioners did actually report substantial income from their investment in 1981-1984. ↩
19. For convenience, we refer to all the warehoused equipment as second-hand. We realize some of the equipment was unused. ↩
20. It is appropriate here to consider respondent's argument that we should take into account Rosen's costs of sale. Respondent argues that because it cost Rosen so much to sell items individually, even if petitioner could obtain a price higher than he paid for the equipment, such price would not represent the fair market value of the property. We disagree. Rosen's costs of sale are not highly relevant to value because they do not tell us what costs petitioner might incur on his resale. Among other economies, petitioner hired unemployed laborers and used help on hand while Rosen hired unionized labor. Petitioner's word of mouth advertising might have supplanted periodical ads. We therefore do not consider Rosen's sale costs in assessing value. ↩
21. One could surmise that the same discount should be applied to all the items for if the unused ones were inflated, the used ones probably were as well. Our research, however, convinces us otherwise. We take judicial notice that a 1975 Ford 5-ton truck that was listed in April 1980 (4 months after the contribution) for around $ 11,500 (the price petitioners assigned the Ford truck) cost around $ 17,000 new in 1975. N.A.D.A., Official Used Car Guide T-49 (April 1980). With additional options bringing the new cost of the truck to $ 26,000, which was the price Rosen paid, the used value would be more than $ 11,500. We are thus persuaded that petitioner did not overvalue the used assets. ↩
22. In Anselmo,↩ respondent's expert testimony supported a value lower than that in the statutory notice, which lower value respondent had asserted in an amended answer. 23. We do reject Lewanda's valuation. At trial he was unable to provide any information regarding his methodology or any other details of the basis for his appraisal. ↩
24. We disagree with respondent that Rosen was unqualified to give an opinion about the equipment's value. The general rule, codified in Fed. R. Evid. 702, is that an owner is qualified to testify regarding the value of his property. Neff v. Rehoe,708 F.2d 639 (11th Cir. 1983). The issue is not one of Rosen's being proffered and qualified as an expert in the technical sense. See LaCombe v. A-T-O, Inc.,679 F.2d 431 (5th Cir. 1982); District of Columbia v. 13 Parcels of Land,534 F.2d 337 (D.C. Cir. 1976). And although a line of authorities would allow exclusion of the testimony where the presumption of an owner's knowledge of the property is rebutted, see District of Columbia v. 13 Parcels of Land, supra,↩ Rosen's involvement for 35 years with the business in which the items were used, and his presumed oversight of their purchase, renders unnecessary an inquiry into those cases. 25. We use Rosen's values. We realize that they are in some measure inaccurate, and using them as a basis for figures to be applied to them as adjustments may seem illogical, but the effort to obtain greater precision, in this inherently speculative endeavor, would not justify the benefit it might yield. ↩
26. We apply this discount to all the unused equipment, including that which, if bought by the lay public, might be bought at a higher price than Rosen paid (i.e., bricks, insulation). We do so because these members of the general public do not comprise the relevant market here, who would not pay more than Rosen did. ↩