LEWIS W. MOORE AND SHIRLEY L. MOORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE
Moore v. Commissioner
Docket No. 32582-83.
United States Tax Court
T.C. Memo 1987-626; 1987 Tax Ct. Memo LEXIS 671; 54 T.C.M. (CCH) 1407; T.C.M. (RIA) 87626; December 30, 1987. Thomas F. Topel, Kenneth *672 L. Cutler, J. Marquis Eastwood, and Maureen H. Parkinson, for the petitioners. Randall G. Durfee and Joel A. Lopata, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency in petitioners' [1] Federal income tax for this year 1980 in the amount of $ 34,872.00. The primary issues for our determination are whether the ownership interest acquired by petitioner in a sale and leaseback transaction was supported by economic substance and whether petitioner acquired the benefits and burdens of any such ownership. Subsidiary issues for our determination are (1) whether the ownership interest acquired, if any, was a present depreciable interest; (2) whether the amount of the limited recourse note exceeds the fair market value of the computer equipment such that petitioner may not deduct interest paid on such note *673 pursuant to section 163; [2] (3) whether petitioner was at risk for certain borrowed amounts pursuant to section 465; (4) whether petitioner was entitled to depreciate certain computer equipment pursuant to the half-year convention method of depreciation in the taxable year 1980; and (5) whether petitioner is liable for additional interest pursuant to section 6621(c). [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in the state of Montana at the time the petition herein was filed. Petitioner is president of the Glendive Broadcasting Corporation; Moore Theatres, Incorporated; Moore Realty, Incorporated; and *674 Glendive Cable Company. Petitioner and his family own all the stock of all the companies of which petitioner is president except Glendive Cable Company. Petitioner owns 50 percent of Glendive Cable Company. In a transaction that is the subject of this case, petitioner purchased from Finalco, Incorporated ("Finalco") certain used peripheral computer equipment [4] (the "Equipment") manufactured by International Business Machines Corporation ("IBM") and, in a simultaneous transaction, leased such equipment back to Finalco. [5]
*675 Finalco
Finalco is the principal subsidiary of Finalco Group, Inc., formerly Financial Analytics Corporation, a publicly-held corporation, the stock of which is traded over-the-counter and reported in NASDAQ quotations. The principal offices of Finalco and the Finalco Group, Inc., are located in McLean, Virginia. During the years in issue, Finalco was a closely-held company. During the years in issue, Finalco typically engaged in leasing transactions involving electronic data processing equipment in which Finalco negotiated and entered into a lease with an end-user, purchased the equipment, financed the purchase with a lending institution, and resold the equipment in a sale and leaseback transaction with an independent third party. The resale of the equipment provided Finalco with much of the capital necessary to generate additional lease transactions. In addition to generating transactions through its own marketing programs, Finalco also acquired equipment subject to existing end-user leases from other leasing companies. During its fiscal year ending June 30, 1979, Finalco entered into lease transactions of approximately $ 129,000,000 based on the original cost of *676 equipment. John F. Olmstead ("Olmstead") was president of Finalco at the time petitioner entered into the transaction. Lease Pro, Inc.
Lease Pro, Inc., ("Lease Pro") is a Montana corporation engaged in the purchase, sale and leasing of computer equipment. Lease Pro has served as a general partner in a partnership that leases personal property, other than computer equipment, and owns an interest in a leased building. Lease Pro was owned by J. L. Dubois ("Dubois") and Dean Schennum ("Schennum"). Dubois acted as the sales agent at Lease Pro. Schennum acted as business manager and administrator. Dubois and Schennum are also the principals in Dubois-Schennum Assoc., Ltd., a Montana corporation organized in August of 1980, and registered with the National Association of Securities Dealers ("NASD") for the purpose of acting as a broker-dealer because leveraged computer investments were clarified as a security under Montana law. Lease Pro acted as sales agent for Finalco in the pursuit to locate investors. Lease Pro received a commission in the amount of ten percent of the equity investment, including cash and any recourse note. During 1979 and 1980, Lease Pro's revenue attributable *677 to Finalco arranged computer investments approximated 90 percent of all revenue it earned. Lease Pro had no shareholders, officers, directors, or employees in common with Finalco Group, Inc., its affiliate, or subsidiaries. In 1980, Finalco changed the structure of Finalco arranged leveraged lease transactions to insert an intermediary purchaser into the chain of title between Finalco and the investor. Lease Pro acted as such an intermediary. The record indicates that the compensation earned by Lease Pro remained ten percent of the equity investment. Finalco prepared all documents and controlled the practice of dating documents. Lease Pro did not appraise computer equipment. Lease Pro relied on Finalco to structure and value all transactions. Comdisco Ownership and the End Users Lease
Early in 1980 Comdisco Incorporated ("Comidsco"), owned the Equipment, some of which was leased to Canteen Corporation (the "Canteen Equipment") and some of which was leased to Aluminum Company of America (the "Alcoa Equipment"). Canteen Corporation ("Canteen") and Aluminum Company of America ("Alcoa") shall be referred to as the "End Users." LaSalle National Bank (the "Bank") financed *678 the acquisition of the Equipment by Comdisco. Comdisco issued two nonrecourse Promissory Notes in favor of the Bank. One Promissory Note (the "Alcoa Note") in the principal amount of $ 219,079.69, dated March 1, 1980, with a maturity date of December 1, 1981, was secured by the Alcoa Equipment. A Second Promissory Note in the principal amount of $ 59,846.04, dated September 1, 1980, with a maturity date of October 1, 1983, was secured by the Canteen Equipment (the "Canteen Note"). The Alcoa Note and the Canteen Note may collectively be referred to as the "Bank Notes." Comdisco granted the Bank a security interest in the Equipment, End User Leases and rental payments from such leases. Pursuant to a Master Lease dated September 8, 1979 (the "Canteen Lease"), Comdisco leased the Canteen Equipment to Canteen. The Canteen Lease was a typical commercial triple net lease with an initial term of 39 months. By amendment effective May 1, 1980, the Canteen Lease contained a clause which allowed Canteen to terminate the Lease after the 24th month of the Lease without penalty if Canteen entered into a 30-month lease with Comdisco for certain equipment at a rate of 90 percent of the then-prevailing *679 net IBM lease rate. Canteen does not have an option to purchase the Canteen Equipment. The terms of the Canteen Lease resulted from arm's-length negotiations between Comdisco and Canteen. The Alcoa Equipment was leased to Alcoa pursuant to a Master Lease (the "Alcoa Lease"), dated October 5, 1979. The Alcoa Lease was a typical commercial triple net lease with an initial term of 24 months, commencing January 3, 1980, and a monthly rental of $ 11,669. By amendment dated December 31, 1979, the Alcoa Lease was modified to give Alcoa the option to upgrade certain disk drives and a second option to terminate specific types of equipment during the first 12 months of the agreement. Alcoa did not have an option to purchase the Alcoa Equipment. The terms of the Alcoa Lease resulted from arm's-length negotiations. Purchase by Blackwood
In a Purchase Agreement (the "Comdisco Canteen Purchase Agreement") dated December 1, 1980, Comdisco sold certain equipment and leases including the Canteen Equipment and the Canteen Lease to Blackwood Corporation ("Blackwood"), a wholly-owned subsidiary of Finalco Group, Inc. and a sister corporation to Finalco. Blackwood assumed debts secured *680 by existing liens on the equipment. Comdisco warranted and acknowledged that all such debts were nonrecourse in nature. The sales price for the Canteen Equipment was $ 46,310.19. The fair market value as set forth in the Comdisco Canteen Purchase Agreement was $ 54,135. In a Purchase Agreement (the "Comdisco Alcoa Purchase Agreement") dated December 1, 1980, Comdisco sold certain equipment and leases, including the Alcoa Equipment and Alcoa Lease to Blackwood. Blackwood assumed debts secured by existing liens on the equipment. Comdisco warranted and acknowledged that all such debts secured by liens on the equipment were nonrecourse in nature. The fair market value of the Alcoa Equipment as specified in the Comdisco Alcoa Purchase Agreement was $ 342,325. The Comdisco Canteen Purchase Agreement and the Comdisco Alcoa Purchase Agreement will sometimes collectively be referred to as the "Comdisco Purchase Agreements." Blackwood executed three Promissory Notes in the principal amount of $ 463,291 each and one Limited Recourse Promissory Note for $ 6,472,495.07, due December 31, 1986. By Bill of Sale, dated December 1, 1980, Comdisco transferred the Alcoa Equipment to Blackwood. *681 When Blackwood acquired the Equipment, it entered into management and remarketing agreements with Comdisco ("Comdisco Management and Remarketing Agreements"). These agreements provided that Comdisco would manage the Equipment until December 30, 1986, at which time either party could terminate the agreements upon 30 days written notice. If an agreement was not terminated, Comdisco had the right to attempt to sell or re-lease the equipment covered by that agreement. Comdisco was to be paid for its services only if it was successful in its selling or releasing efforts. Comdisco, a publicly-held Delaware corporation, is unrelated to Finalco and is a competing equipment leasing company that buys and sells new and used IBM computer equipment and arranges leases on such equipment. Assignment to Finalco
In Agreements dated December 2, 1980, Blackwood assigned all its right, title and interest in the Equipment to Finalco to enable Finalco to consummate the sale and leaseback transactions with persons desiring to acquire the Equipment. Finalco agreed to assume all of Blackwood's obligations pursuant to the Comdisco Purchase Agreement and Comdisco Management and Remarketing *682 Agreement. Inquiry by Petitioners
During 1980 and 1981, petitioner received substantially increased dividend distributions from his business entities. The increased dividend distributions were attributable, in part, to an excess accumulation of cash by Glendive Cable Company. Early in December of 1980, Curtis Ammondson ("Ammondson"), CPA, contacted petitioner regarding a possible investment in computer equipment. Ammondson had been petitioner's accountant for 20 years and was also the accountant for the closely held-corporations in which petitioner was a shareholder. Ammondson first heard of transactions involving the purchase of computer equipment from David Nortman ("Nortman"), a Lease Pro salesman in Great Falls, Montana. On December 23, 1980, Finalco prepared a sample projections (the "Projections") which Ammondson analyzed. The Projections showed that the after tax savings from the time of investment in 1980 through 1984 were projected to be $ 126,494. The taxes to be paid on the anticipated profits from 1985 through 1988 were projected to be $ 89,834 yielding an overall net tax savings of $ 36,660. The Projections assumed petitioner would make an equity investment *683 of $ 77,000, which is $ 12,147 greater than their projected net tax savings. Ammondson determined that the proposed investment would be profitable if the computer equipment purchased was leased for more than six years and had a high resale value at the end of the lease. Ammondson did not consider himself to be a computer specialist nor did he believe he was qualified to value computer equipment. Ammondson relied on the representation of Nortman as to the value of the Equipment. Ammondson discussed the proposed transaction and Finalco's reputation with Robert Murray ("Murray"), a partner at McGladrey, Hendrickson and Compnay ("McGladrey"), who had personally invested in a Finalco computer leasing transaction. Murray also represented several clients who had invested in similar transactions. Ammondson recommended the investment to petitioner because, in his view, the investment had the advantages of tax deferral in early years and an economic return on investment, without regard to tax savings,in later years. Petitioner was in La Jolla, California, during December of 1980 so Ammondson explained the leasing transaction to petitioner by telephone. On December 21, 1980, petitioner *684 authorized Ammondson, as petitioner's attorney-in-fact, to enter petitioner into the leasing arrangement. At the same time, Ammondson personally invested in a similar Finalco arranged leasing transaction which is a pending case before this Court. Ammondson was familiar with documents executed on behalf of petitioner. Petitioner relied solely on Ammondson for advice regarding the transaction. Agreement Between Finalco, Lease Pro And Petitioners
In 1980, Finalco adopted the practice of inserting an intermediary owner in the chain of title between Finalco and the investor. Lease Pro served as such an intermediary owner. Finalco adopted the practice on the advice of certain law firms. DuBois first learned of the intermediary structure from a sale Lease Pro executed with Finalco in which Finalco used an intermediary known as Gateway Aviation. Finalco purchased the computer equipment, arranged the end-user leases and bank financing. Lease Pro solely located equity investors. Lease Pro did not appraise or value computer equipment nor did Lease Pro determine the cost of the transaction to any investor. Finalco controlled all of the documents and controlled the dates of the *685 transactions. In 1980, Finalco had adopted the practice of utilizing a one-page document to bind all parties when an investor agreed to purchase and lease equipment near the end of a taxable year. This procedure was adopted because Finalco did not have time to prepare all of the documents before the end of the year. On December 22, 1980, petitioner, who was in California, authorized Ammondson to act as his agent to purchase the Equipment for him by signing the documents required by the one-page agreement. The one- page agreement contained the essential terms of the transaction. On December 22, 1980, Ammondson, as agent for petitioner, executed a one-page agreement among petitioner, Lease Pro and Finalco (the "One-Page Agreement"). The One-Page Agreement provided that Finalco agreed to sell and Lease Pro agreed to buy the Equipment at a purchase price of $ 431,491, payable as follows: Cash
$ 9,146
Recourse Promissory Note
67,000
Full Recourse Installment Note
355,345
TOTAL   $ 431,491
The One-Page Agreement provided that Lease Pro agreed to sell and petitioners agreed to buy the Equipment for a purchase price of $ 433,045, payable as follows: *686 Cash
$ 10,000
Recourse Promissory Note
67,700
Limited Recourse Installment Note
355,345
TOTAL    $ 433,045
On such date, Ammondson did not know specifically the items of the Equipment to be acquired. Finalco agreed to lease the Equipment from petitioner for a term of 96 months at a rental of $ 5,763.83 per month. In addition, after the 72nd month of petitioner's lease to Finalco and continuing until the end of that lease, 50 percent of net rentals received by Finalco from any end user lease would be paid to petitioner ("Interim Revenue"). The parties agreed to execute documents referred to in the One-Page Agreement at a later date. Those documents were incorporated by reference in and made a part of the One-Page Agreement. Although copies of the sample documents were not physically attached, Ammondson received and reviewed copies of sample documents prior to the time petitioners executed the One-Page Agreement. Ammondson entered into a similar transaction for himself and was familiar with the content of the sample documents. DuBois executed the One-Page Agreement on behalf of Lease Pro on December 22, 1980. Finalco executed the One-Page *687 Agreement on December 30, 1980. On December 22, 1980, petitioner mailed a cashier's check in the amount of $ 10,000 to Lease Pro. Petitioner incorrectly made the check payable to the order of Finalco rather than Lease Pro. On December 22, 1980, Ammondson, as agent for petitioners, executed a full recourse Promissory Note and Security Agreement (the "Recourse Note") in the amount of $ 67,700 in favor of Lease Pro. On December 22, 1980, Ammondson, as agent for petitioner, attempted to execute an Agreement of Assumption; however, neither the assumed amount or the lender were identified. Ammondson merely signed the Agreement of Assumption in blank form. The Agreement of Assumption was one of the documents that Lease Pro provided Ammondson on December 22, 1980, as part of the document package to be executed. Any payments petitioners made on the Agreement of Assumption reduces the recourse portion of the Limited Recourse Note they executed in favor of Lease Pro. The amount assumed was never intended to be in addition to the purchase price. Sale to Lease Pro
In 1981, after Finalco prepared the documents required by the One-Page Agreement, Finalco and Lease Pro executed a Prchase *688 Agreement (the "Finalco Purchase Agreement"), whereby Finalco transferred the Equipment to Lease Pro. The total purchase price of $ 431,491 was payable as detailed on the One-Page Agreement. Lease Pro delivered petitioner's Recourse Note for $ 67,700 to Finalco in 1981 in lieu of issuing its own note to Finalco for $ 67,700. In 1981 Lease Pro executed and delivered a Full Recourse Promissory Note for $ 355,345 in favor of Finalco. It included a deferral provision, providing that if petitioner did not pay Lease Pro amounts due on the Limited Recourse Note, Lease Pro could defer payment to the extent of the recourse amount of petitioner's Limited Recourse Note. Lease Pro's right to defer payments continued so long as petitioner was in default, but in no event could the deferral extend beyond December 1, 1990. The deferred amounts did not bear additional interest. By Bill of Sale, Finalco transferred the Equipment to Lease Pro, subject to the Lien, the End User Leases and the rights of Comdisco. Early in February of 1981, petitioner executed all documents required by and incorporated in the One-Page Agreement. These documents conformed with the sample documents Ammondson had *689 reviewed before December 22, 1980. Included were the following: (a) a Purchase Agreement (the "Lease Pro Purchase Agreement") providing that petitioner purchase the Equipment from Lease Pro for a total purchase price of $ 433,045 as detailed in the One-Page Agreement. (b) a Limited Recourse Promissory Note-Security Agreement (the "Limited Recourse Note"), dated December 1, 1980, in favor of Lease Pro in the amount of $ 35,345 plus interest at the rate of 12 percent per year. (c) a second Agreement of Assumption (the "Assumption") in which petitioner assumed on a recourse basis $ 179,668 of the Bank Note. The Limited Recourse Not was to be paid by 96 equal monthly payments of $ 5,718.18 each. According to its terms, petitioner was personally liable for $ 179,668 (the "Recourse Amount") of principal plus accrued interest. Petitioner's obligations under the Limited Recourse Note in excess of the Recourse Amount could be satisfied only out of the rent and other proceeds of the Equipment. The Limited Recourse Note contained a deferral of payment provision providing that in the event that Finalco does not pay rent to petitioner, petitioner may defer payment of principal *690 and interest, to the extent of the unpaid rent. The right to defer payments terminates on the earlier of the receipt of the delinquent rental payments or December 1, 1990. To secure the obligation represented by the Limited Recourse Note, the Limited Recourse Note granted Lease Pro a purchase money security interest in (i) the Equipment, (ii) any lease of the Equipment, and (iii) the proceeds from the transfer or lease of the Equipment. In February of 1981, a second Agreement of Assumption was executed to replace the earlier Agreement of Assumption signed by Ammondson in blank on behalf of petitioners on December 22, 1980. It was not intended to alter or enlarge petitioner's liability or the indebtedness being assumed. The Assumption was on a full recourse basis. Finalco sent the executed Assumption to the Bank. In the event that petitioner is required, pursuant to the Assumption, to pay amounts due on the Bank Note, all amounts paid shall be deemed prepayments of the Recourse Amount under the Limited Recourse Note. Petitioner satisfied the Recourse Note by payment of four annual installments such that the final payment on the Recourse Note was paid on December 10, 1984. *691 By June 1, 1981, the Lease Pro Purchase Agreement, Limited Recourse Note, Owner Lease, Remarketing Agreement and Finalco Purchase Agreement were amended to correct an error in the equipment listing that had been attached to those agreements. Lease to Finalco
Early in February of 1981, petitioner executed a Lease Agreement ("Owner Lease") between petitioner and Finalco, effective December 1, 1980, providing that Finalco would lease the Equipment from petitioner. The term of the Owner Lease was from December 1, 1980, to December 31, 1988 (the "Original Term"), at a monthly rental of $ 5,763.82. Pursuant to an Assignment dated December 1, 1980, petitioner mistakenly assigned the Owner Lease to Gateway Aviation Holdings, Ltd. as additional security for payment of the balance due under the Limited Recourse Note. Gateway Aviation Holdings, Ltd, was another intermediary owner inserted in the chain of title by Finalco in Certain other transactions. The assignment reflected a drafting error as the parties intended to assign the Owner Lease to Lease Pro. Petitioner received $ 45.64 per month from Finalco which was the rent owed by Finalco after deducting the Limited Recourse Note *692 payments owed by petitioners to Lease Pro (the "cashflow"). Remarketing and Residual Sharing
Early in February of 1981, petitioners signed a Remarketing Agreement ("Remarketing Agreement") and Residual Sharing Agreement (the "Residual Sharing Agreement"). Pursuant to the Remarketing Agreement, petitioner agreed to pay Finalco for remarketing services performed by Finalco, ten percent of the proceeds received by petitioners from the sale or re-leasing of the Equipment at the end of the Owner Lease. The Residual Sharing Agreement provided that after the 72nd month of the Owner Lease and continuing until the end of the Owner Lease, all proceeds from leasing the Equipment will be distributed 50 percent to petitioner and 50 percent to Finalco. At the end of the Owner Lease all proceeds from the sale or re-lease of the Equipment will be distributed to petitioner until they have received 120 percent of their net equity in that Equipment. Net equity is defined as the sum of petitioner's cash payments less cash flow distributions to petitioners. Thereafter, petitioner will receive all proceeds but is obligated to pay Finalco a commission of 20 percent of the remaining proceeds *693 if Finalco is responsible for the sale or re-lease of the Equipment. By amendment dated December 1, 1980, the Remarketing Agreement between Finalco and petitioner was amended to replace the Canteen Equipment schedule to conform to the schedule attached to the Purchase Agreement between petitioner and Lease Pro. The Purchase Agreement refers to the existence of the Comdisco Management and Remarketing Agreement but contains no reference to the Comdisco Management and Remarketing Agreement with respect to the effect of the remarketing provisions of the Purchase Agreement where Comdisco remarkets the Equipment. The Comdisco Management and Remarketing Agreements is referenced in a document titled "Agreement as to Prior Liens, Encumbrances, and Assignments" dated December 1, 1980 which petitioner signed at the time of entry into the transaction. According to Olmstead, Finalco is entitled to a 20 percent commission if and only i f it is responsible for the sale or re-lease of the Equipment. According to Phillip Hewes ("Hewes"), a staff attorney at Comdisco who drafted the Comdisco Management and Remarketing Agreement, Comdisco is entitled to a commission if an only if Comdisco is responsible *694 for the sale or re-lease of the Equipment. Hewes provided no indication that Comdisco intended to manage and remarket the Equipment beyond the initial use of the End User or to otherwise service petitioner as Owner beyond such time as the End User terminated the use of the Equipment. The terms of the Comdisco Management and Remarketing Agreement indicate that such Agreement was drafted to benefit Comdisco and was a necessary requirement of the sale toFinalco pursuant to the Comdisco Purchase Agreement. Practice of Dating Documents
The Purchase Agreement and related documents were signed by petitioners in February of 1981; however, the documents bore earlier dates, generally December 1, 1980. The One-Page Agreement which required the execution of these documents was not signed by Ammondson until December 22, 1980. The documents executed by petitioners in February, 1981 were prepared by and the dates inserted by Finalco. Finalco generally dated the documents transferring title to equipment on or before the date of the end user lease so that the banks that financed the acquisition of the equipment would have a first perfected security interest in the equipment. According *695 to Olmstead, Finalco's practice was never to date documents in a year prior to the tax year in which the investor purchased the equipment; if the investor purchased the equipment in the last half of a taxable year, the documents were never dated in the first half of the taxable year. The documents in this case were dated in 1980 because of the End User Leases. Finalco believed that the parties had entered into a binding agreement before the end of 1980 and the documents signed in 1981 were incorporated by reference in and made a part of the One-Page Agreement. Industry Conditions
The market for third party leasing of computer equipment developed rapidly in the 1970's. Projections of residual values are critical to evaluate an investment in computer equipment. Such projections vary among experts and fluctuate with market conditions. Computers do not depreciate with age, but rather are subject to technological obsolescence. Because IBM dominates the computer industry, the technology advancements of IBM products have significant impact upon the residual value of progenitors. Industry experts have had varied success in the ability to predict technology advancements of IBM. *696 The volume of used computer equipment transactions can be discerned from the advertisement of the weekly trade journal Computer World. IBM has the largest market share and IBM computer prices are evidenced in the Computer Price Guide ("the Blue Book"). [6]
The computer industry has been dominated by the technological advancements and the strategic product planning of IBM for nearly three decades. In 1964, IBM introduced the IBM 360 Series of computers. The 360 unified a diverse line of computers into a single new compatible family. In 1971, IBM introduced the 370 series. The available 370 configurations were designed to extend from low demand end users to high demand end users. The sales performance of mid-range products was unsatisfactory to IBM. High demand end users were willing to acquire the latest technology *697 thereby creating a market demand for high demand end users. The emergence of a significant market in the low demand end user market created a market demand for low demand end user products. In June of 1976, IBM announced the 370/138 and the 370/148 computers which were designed to enhance the sales performance of the products within the mid-range 370 series. The price performance capabilities of the 370/138 and 370/148 out distanced the earlier 370 series computers. The initial market reaction was highly favorable such that during 1977 the fair market value in the used equipment market of 370/138 and the 370/148 exceeded the IBM list price. The computer industry was generally tranquil during the mid-1970's. In March of 1977, IBM introduced the 303X computer. Despite introduction of the 303X and the IBM price reductions on the 370/158 and 370/168, prices of used computers remained at relatively high and stable values. The Blue Book stated in the July, 1977 issue that most of the equipment in general use at that time will have substantial value at the end of the 1980's. In October of 1977, IBM announced two additional 303X computers, the 370/3032 and the 370/3031. Datamation *698 magazine, an industry publication, noted that the new processors were so similar to the 370/158 and the 370/168 that "the industry yawned as IBM this fall announced the much rumored 3031 and 3032 central processor." The 370/158 and 370/168 were of comparable price performance capabilities to the 370/303X family. During the late 1970's, IBM was faced with increased competition from manufacuturers of plug compatible equipment, imitation IBM equipment designed to displace IBM equipment, particularly plug compatible central processors. IBM also faced increased competition from manufacturers of mini computers. In January of 1979, IBM introduced the 4300 series. The industry had not expected the drastic increase in the price performance capabilities presented by the 4300 series. The IBM marketing strategy undertaken to react to the plug compatible processors and the mini computer market significantly reduced the previous prognostications of mainframe residual values. While the mainframe market was devastated following the introduction of the 4300 series in January of 1979, the market for peripheral equipment remained somewhat stable. The primary factor for such occurrence was that *699 most peripheral equipment for the 360 and 370 series was compatible with the 303X series and, significantly, the 4300 series. The residual value of IBM peripheral equipment for any such series was generally insulated from the adverse market effect of subsequently introduced central processors due to the compatibility of most peripheral equipment. Furthermore, the basic electromechanical nature of peripheral equipment precluded the rapid technological advancements inherent to mainframe products. The Equipment and Expert Testimony of Value
Petitioner purchased the following IBM peripheral equipment: Year of
Machine
Market
End User
Quantity
Type
Description
Delivery
Alcoa
2
3211-1
Pringer Unit
1970
2
3211-1
Control Unit
1970
2
3333-1
Dual Master
1971
Disk Drive 1
3330-1
Dual Share
1971
Disk Drive 4
3350B2
Dual Share
1976
Disk Drive 1
3350A2
Dual Master
1976
Disk Drive 1
3830-2
Disk Control
1972
with Features [7]Canteen
1
3803-1
Tape Control
1971
Unit 3
3420-7
Magnetic Tape
1971
Unit *700 Esmond C. Lyons, Jr. ("Lyons") was qualified to testify as an expert on behalf of petitioner. Lyons is the principal management consultant in the Information, Services and Systems Division of SRI International ("SRI"), formerly known as the Stanford Research Institute. SRI is a not-for-profit corporation which is involved in technology research and management consulting for business and government clients. Dee Morgan ("Morgan") was qualified to testify as an expert on behalf of respondent. Morgan has worked for IBM as a systems service representative and for Burroughs Corporation as a technical service representative. From 1965 through 1983, Morgan was employed by the General Services Administration ("GSA") as a computer equipment analyst and data processing systems coordinator. While employed with GSA, Morgan provided estimates of residual value and economic life of computer equipment to the Defense Contract Audit Agency. Lyons determined the following fair market values for the Equipment as of December, 1980: IBM
Blue Book
End User
List Price
Value
Alcoa
$ 516,860
$ 335,959
Canteen
99,820
37,932
$ 616,680
$ 373,891
Lyons concluded *701 within his report that petitioner's cost to acquire the Equipment was somewhat high, unless special conditions were attendant to the transaction. Lyons determined the eight-year residual value of the Alcoa Equipment as of the December, 1980 to be as follows: Alcoa Equipment
Quantity
Machine Type
Residual Value
Percent of IBM
List Price
Dollar Value
2
3211/3811
10-30
5,000 - 15,000
1
3830-2
10-20
7,000 - 14,000
3
3333/3330
0-10 0 - 10,000  5
3350 A2, B2
10-20
15,000 - 30,000
Considering the 3830-2, the two 3211/3811's, the three 3330/3333's and the five 3350's, the cumulative eight-year residual value of the Alcoa Equipment as determined by Lyons as of December, 1980 would have been between $ 45,000 and $ 70,000, [8] or approximately 10 to 15 percent of the IBM list price. Lyons determined the eight-year residual value of the Canteen Equipment as of December of 1980 to be as follows: Canteen Equipment
Residual Value
Quantity
Machine
Percent of IBM
List Price
Dollar Value
1
3803-1
15-20
3,500 - 5,000
3
3420-7
8-10 2,000 - 2,500
*702 Considering the 3803-1 and the three 3420's, the cumulative eight-year residual value of the Canteen Equipment as determined by Lyons as of December of 1980 would had been between $ 10,000 and $ 13,000, or approximately 10 to 13 percent of the IBM List price. Morgan determined the following fair market values of the Equipment as of December, 1980: [9]
IBM
Blue Book
End User
List Price
Value
Alcoa
$ 548,050
$ 356,000
Canteen
88,520
49,500
$ 636,570
$ 405,500
Morgan concluded that the fair market value of the Equipment during December of 1980 was $ 396,460, such amount being approximately five percent below the Blue Book asking price and also being the fair market amount as indicated in the Comdisco Purchase Agreements. Morgan concluded that in December of 1980 it would have been reasonable to conclude that the residual value of the Equipment on December 1, 1986, the *703 Interim Revenue date pursuant to the Residual Sharing Agreement, and on December 1, 1988, the termination date of the Owner Lease to be as follows: End User
Machine
Residual Value
Equipment
Type
Quantity
12-1-1986
12-1-1988
Alcoa
3350-82
4
$ 10,000
$ 2,000
3350-A2
1
3,500
700
3820-2 1
3,000
1,500
Canteen
-0-
-0-
$ 16,500
$ 4,200
Tax Reporting
Petitioner is a cash basis reporting on a calendar year basis. After the close of calendar year 1980, petitioner received from Finalco documents entitled Tax Summary for the year ending December 31, 1980, for the Canteen Equipment and the Alcoa Equipment, setting forth the following information which was used by petitioner in filing his 1980 Federal income tax return: Finalco Lease Income
$ 5,763.82  Expenses (Depreciation)
( 64,956.75) Taxable Income (Loss)
($ 59,192.93)
Finalco prepared a completed Class Life Asset Depreciation Range System Form 4832 for the year 1980, a copy of which petitioner attached to the 1980 Federal income tax return. Petitioner elected the half-year convention using 150 percent declining balance method of *704 depreciation and a five-year useful life. For each of calendar years 1980 through 1984, inclusive, petitioner reported on his Federal income tax return a net loss from his equipment purchase and leaseback transactions with respect to the Equipment, as follows: Taxable Year Ended
Net Loss
December 31, 1980 59,192.93 December 31, 1981
91,854.39
December 31, 1982
51,987.84
December 31, 1983
38,888.41
December 31, 1984
31,279.00
For calendar year 1985, Finalco projected that petitioner would recognize taxable income from his equipment purchase and leaseback transaction in the amount of $ 9,907.00. OPINION The present case in a companion case selected as a representative test case for a large number of dockets involving the investment in Finalco arranged sale and leaseback transactions of leveraged computer equipment. [10] The issues presented here are similar to those presented in the companion cases except that the transactional structuring differed in certain pertinent respects. *705 At the outset, we address respondent's primary assertion that petitioner's transactions with respect to the Equipment were a tax-avoidance scheme devoid of economic substance which is to be disregarded for Federal income tax purposes. Petitioner asserts that ownership of the Equipment for Federal income tax purposes has been established where petitioner entered the transaction with the requisite business purpose and the transaction was supported by economic substance. Taxpayers are generally free to structure their business transactions as they please, though motivated by a tax reduction considerations. Gregory v. Helvering293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). However, it is well settled that a transaction entered into solely for the purpose of tax reduction and which is without economic, commercial or legal purpose other than the expected tax benefits is a sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196; *706 Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). The existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra;Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). A transaction which is devoid of economic substance is not recognized for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. at 573; Knetsch v. United States,364 U.S. 361, 366 (1960). In the sale and leaseback context, we set forth a standard that the nonuser-owner recipient of tax benefits must specifically establish that the entry into the transaction was motivated by business purpose to justify the form of the transaction and that the transaction was supported by economic substance. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 201-203. [11] In Rice's Toyota World, Inc., we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196. *707 [12]
Our inquiry of business purpose and economic substance is inherently factual as indicated in several recent cases concerning sale and leaseback transactions of computer equipment. Torres v. Commissioner,88 T.C. 702 (1987); Bussing v. Commissioner,88 T.C. 449 (1987), Supplemental Opinion 89 T.C.    (filed Nov. 24, 1987); Gefen v. Commissioner,87 T.C. 1471 (1986); Mukerji v. Commissioner,87 T.C. 926, 968 (1986); James v. Commissioner,87 T.C. 905 (1986); Coleman v. Commissioner,87 T.C. 178 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987); Estate of Thomas v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, supra.[13]
*708 We noted in Rice's Toyota World that the drawing of a precise line of demarcation between valid and invalid transactions is invariably difficult. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 197. In this context, petitioner bears the burden of proof as respondent's determination that the transaction was a tax-avoidance scheme devoid of economic substance is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Based on our review of the record herein, we conclude that the transaction was not motivated by a business purpose and was devoid of economic substance so as to be disregarded for Federal income tax purposes. We are convinced that the form of the transaction and the attendant inquiry demonstrated by petitioner belies a determination that petitioner manifested a business purpose. Petitioner relied solely on the advice and inquiry of Ammondson. Ammondson explained the computer leasing transaction by telephone conversation while petitioner was in La Jolla, California. Petitioner authorized Ammondson to sign the One-Page Agreement based on such telephone conversation. Ammondson did not specifically know *709 the items of the Equipment at the time he executed the One-Page Agreement as petitioner's attorney-in-fact other than that IBM manufactured the Equipment. Petitioner was in Montana during the last week of December and made no effort regarding the transactions. Ammondson's sole inquiry concerning the fair market and residual valuation of the Equipment was to confer with Murray at the accounting firm of McGladrey. Ammondson was aware that the existence of economic profit depended upon significant residual value of the Equipment and the receipt of contingent Interim Revenue, yet no effort to determine or otherwise evaluate the economic potential for profit was performed. Petitioner and Ammondson were clearly motivated by the attendant tax considerations of the Finalco arranged lease. We find that the fact Ammondson and Murray had entered similar transactions with Finalco to be immaterial to our determination. We are convinced that petitioner did not manifest a business purpose necessary to justify the form of the transaction. We perform an objective analysis of the transaction to determine whether any realistic opportunity for economic profit existed exclusive of the propitious *710 tax benefits. In so doing, we analyze the transaction as a prudent investor. Rice's Toyota World, Inc. v. Commissioner, 1 T.C. at 209. The parties rely on expert testimony to establish the fair market value and residual value of the Equipment as of December of 1980. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Chiu v. Commissioner,84 T.C. 722, 734 (1985). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Based on our analysis of this record, we determine that the transaction was not supported with economic substance such that the transaction did not present a realistic potential for profit. The Purchase Agreement between petitioner and Lease Pro [14] included the Alcoa Equipment and the Canteen Equipment. The Purchase Agreement stated that the cost of the Equipment to be the amount of $ 433,045 but did not separately state the individual cost of the Alcoa *711 Equipment and the Canteen Equipment. [15] Petitioner's expert Lyons determined the separately stated purchase price to be as follows: Alcoa Equipment
$ 378,910
[16]Canteen Equipment 54,135
$ 433,045
We are satisfied that petitioner paid an amount in excess of fair market value for the Equipment. The experts did not agree on the IBM list price or the Blue Book value of the Equipment *712 even though each expert valued the Equipment as of December of 1980. We appreciate the difficulty encountered to prognosticate a 96-month residual value of computer equipment; however, we are somewhat perplexed as to the disagreement regarding the IBM list price and the published Blue Book value in December of 1980. Petitioner's expert, Lyons, separately stated the petitioner's cost of the Alcoa Equipment to be $ 378,910 and the Blue Book value to be $ 335,959. Morgan determined the Blue Book value to be $ 356,000. Because Morgan viewed the Blue Book as a negotiable asking price, she determined the fair market value of the Alcoa Equipment to be $ 342,325 such amount being designated in the Comdisco Purchase Agreement as the fair market value of the Alcoa Equipment. Finalco through Blackwood paid the amount of $ 342,325 for the Alcoa Equipment. We attribute a reasonable degree of value to the circumstance that petitioner acquired an arranged leveraged lease subject to an end-user commitment. Mukerji v. Commissioner,87 T.C. at 965. We find no justification for the amount petitioner paid for the Alcoa Equipment other than the desire of Finalco to inflate the *713 purchase price. See James v. Commissioner, supra.The fair market value of the Alcoa Equipment as arranged by Finalco was not in excess of the Blue Book amount of $ 356,000 as determined by Morgan. The Blue Book amount offered by Lyons is less than the amount Finalco paid through Blackwood pursuant to the Comdisco Purchase Agreement. For such reason, we find Morgan's view to be more accurate. Within his report, Lyons stated that "unless there were special conditions to the transaction, we consider the price that was paid to be somewhat high." We agree with Lyons in this respect. The special conditions were the inflated basis to generate an excessive depreciation deduction and the benefit of operating cash flow to Finalco at such time as the Alcoa Note was satisfied. We are also certain that petitioner paid an amount in excess of fair market value for the Canteen Equipment. The Purchase Agreement as executed by petitioner did not schedule the correct equipment due to administrative error at Finalco. By amendment backdated to December 1, 1980, Finalco attempted to correct the equipment schedule. However, Finalco incorrectly represented that petitioner acquired *714 five IBM 3420-7 Magnetic Tape Units. The Canteen Equipment in fact included three IBM 3420-7 Magnetic Tape Units as represented in the Comdisco Purchase Agreement. Lyons submitted two reports so as to value each scenario. Lyons determined that the amount of $ 54,135 was a "beneficial" price to pay for five IBM 3420-7 Magnetic Tape Units. Lyons concluded that the purchase price of $ 54,135 was "somewhat high" to acquire three IBM 3420-7 Magnetic Tapes Units. At trial, Lyons stated that the purchase price paid for the three units actually acquired was "within the range" of the premium to be paid for an arranged leveraged lease subject to an end-user commitment. While we find the methodology and testimony of Lyons to be generally credible, we find such assertion to be without support. Lyons determined the Blue Book value of the Canteen Equipment to be $ 37,932 with the acquired three IBM 3420-7 Magnetic Tape Unit price at $ 8,101 per unit; yet, he asserts that $ 54,135 was "within the range" of a reasonable value. Such statement is without basis and sets the perimeters of ranges at unacceptable limits. In our view, petitioner paid the fair market value or a "beneficial price" *715 for five IBM 3420-7 Magnetic Tape Units, and we agree with Lyons that the amount of $ 54,135 was a fair market value for such equipment if included in the Canteen Equipment. Nonetheless, the record is clear that petitioner in fact acquired only three IBM 3420-7 Magnetic Tape Units and that petitioner paid, according to Lyons, 54 percent of the IBM list price at such time that the Blue Book asking price for the Canteen Equipment was 38 percent. We are certain that petitioner paid for equipment not included in the Canteen Equipment. Consequently, petitioner paid an amount in excess of fair market value. While we attribute a reasonable degree of value to the circumstance that petitioner acquired an arranged leveraged lease subject to by an end user commitment, the amount paid by petitioner was excessive. See James v. Commissioner,87 T.C. at 920; compare Mukerji v. Commissioner,87 T.C. at 965. We now address whether the residual value of the Equipment and any Interim Revenue to be received by petitioner provided petitioner with a realistic potential for profit. Petitioner is entitled to cash flow during the 96-month Owner Lease in the amount of *716 $ 4,381.44. Lyons provided a range of residual value for each transaction. [17] We found the general methodology of Lyons to be credible. We are satisfied that Lyons relied solely upon methods and data available in December of 1979 to determine the residual values. Lyons analyzed the historical performance of pre-existing equipment designed to perform functions similar to that of the Equipment to determine economic life. Lyons reviewed the previous price performance of the Equipment and analyzed current developments to determine whether the technological obsolescence of the Equipment was expected. Lyons noted that the prognostication of residual values was subject to different views within the industry. To illustrate such point, Lyons appended to his report an article from the December 1, 1980 issue of Fortune Magazine titled "Fortune-Tellers in the Computer Bazaar." Such article compared the predictions firms made in 1979 and 1980 for the 198a residual value of the IBM 3033. The Owner Leases at issue were for 96 months rather than a one- to two-year period which presented the fortune-teller of the Equipment with a formidable task. Consequently, the prognostication in December *717 of 1979, of the 96th month residual values at issue was certainly a task thick with mist. As one computer broker quoted in the Fortune Magazine article stated, "all the estimators do is throw darts at a board." In this context, we do not fault the opinion testimony of Lyons which cast the residual values in their form of range. For such reasons and as further discussed herein, we accept the low-range residual value of Lyons in each transaction. The testimony of Lyons is flawed in an aspect of paramount significance in this transaction. The record indicates that a critical aspect of the transactions at issue was the effect of the Residual Sharing Agreements in the performance of our objective analysis. The Residual Sharing Agreements provided that petitioner was entitled to share 50 percent of all Interim Revenue with Finalco commencing after the 72nd month of the Owner Lease. An opinion as to the amount of contingent Interim Revenue to be received is a fundamental variable in our objective analysis. *718 Interim Revenue is to be shared for a period of 24 months which we find to be a significant aspect of the transaction from an economic view. The Residual Sharing Agreements provided that petitioner was entitled to all Residual Revenue until petitioner received cumulative cash distributions equal to 120 percent of Net Equity. Any Interim Revenue received by petitioner reduced the Net Equity amount as did the cash flow generated from the Owner Lease. Lyons provided residual values for the Equipment solely as of the termination of the Owner Leases. Lyons provided no contingent rent analysis regarding Interim Revenue to assist in our determination of economic substance. The record provides no indication as to the criteria used by Finalco to determine the Interim Revenue sharing commencement date. We are not satisfied that the ranges of residual value are sufficient to imbue the transaction with economic substance. The Interim Revenue provision which provided that petitioner receive 50 percent of any rental income generated by Finalco during the last 24 months of the Owner Lease is pivotal to any determination. The record does not indicate the December of 1980 prognostication of reasonable *719 rents commencing in December of 1986. The record does not indicate whether renewal by an end user was typical or the degree of negotiation concerning any rental rate of end user. The lease commitments structured by Comdisco with Alcoa and Canteen were short-term leases which provided the end user flexibility. We are unable to discern whether Interim Revenue was realistic and, if so,in an amount sufficient to imbue the transaction with economic substance. Based on our examination of this record, we conclude that Finalco primarily packaged a program of tax benefits for sale to petitioner and retained economic benefits during the original term of the Owner Leases and retained a further interest in the Remarketing Agreements and the Residual Sharing Agreements. In Murkerji, the taxpayer Mukerji entered into a transaction which provided "additional rent" similar to the Interim Revenue provisions herein to be paid by Comdisco to the taxpayer during the last 24 months of an owner lease. Mukerji v. Commissioner,87 T.C. at 929. In that case, Comdisco retained no remarketing and residual interest in the transaction similar to those which Finalco retained here that *720 further reduce any economic profit to the taxpayer. In the instant case, Finalco has exerted much imagination to retain the economic benefits of the transactions while giving the appearance of economic substance. We have stated previously that the drawing of a precise demarcation between those transactions that are supported with economic substance and those that are not so supported is invariably difficult. Based on this record, the omission of Lyons to provide testimony of reasonably expected Interim Revenue coupled with the retained interests of Finalco in the Remarketing Agreement as well as the Residual Revenue provisions and Interim Revenue provisions of the Residual Revenue Sharing Agreement has to a significant extent thwarted our analysis of economic substance. We restate that in this critical respect, the burden of proof is on petitioner as respondent's determination that the transactions were tax-avoidance schemes devoid of economic substance is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The Alcoa equipment included two printers and two generations of disk drives. The printer and the earlier generation of disk drive *721 were both introduced in 1971. The newer generation disk drive, the IBM 3350, was introduced in 1976. Morgan determined a 15-year economic or technological life for the printers and a 14-year economic or technological life for the disk drives based on a historical analysis of progenitor products. Morgan also considered plug compatible competition with respect to the disk drives and IBM price reductions of 20 percent in October of 1978 and May of 1979 with resepct to the IBM 3350 disk drive. Morgan determined the residual value of the Alcoa Equipment to be $ 16,500 in December of 1986 and $ 4,200 in December of 1988 at the termination of the Owner Lease. The Canteen Equipment included the IBM 3420-7 Magnetic Tape Units and the IBM 3801 Control Unit. Morgan determined that prior generations of tape drives had an economic life of 15 years. Lyons stated that he was not aware of any historical precedent to indicate a longer life than 15 years. Based on the introduction date of 1971, Morgan concluded that the Canteen Equipment would be of zero residual value in 1986 at the Interim Revenue commencement date and zero at the termination date of the Owner Lease in 1988. We are persuaded *722 that historical analysis of progenitor products is simply one aspect of residual valuation. Morgan relied solely on historical analysis of economic life. We are certain, as is indicated in the Fortune Magazine article, that residual valuation in December of 1980 for a period of 96 months was without question a difficult task. Our determination must be whether the 96-month residual value offered petitioner a realistic opportunity for profit. Given this industry, the age of the equipment, and the length of the owner leases, we are satisfied that the prudent investor would question whether the Equipment would retain significant residual value. [18] We fault Morgan's analysis for reliance solely on historical analysis. We fault Lyons' analysis, however, for the failure to delineate the historical analysis relied upon to determine residual values. In our view, the low-range 96-month residual value offered by Lyons was realistic to expect as of December of 1980. We accept Morgan's view as to the residual value of the Equipment at the commencement of the Interim Revenue. [19]
*723 We are impelled to address the interest acquired by petitioner due to the Comdisco interest in the Comdisco Remarketing and Management Agreement and the Finalco interest in the Residual Sharing Agreement and the Remarketing Agreement. The record does not indicate that other dealers of computer equipment in the secondary market were available and capable to remarket Equipment at more favorable rates to petitioner. Finalco knew the location, status, and condition of the Equipment. We find it a fair inference that Finalco was relied upon by petitioner and was the sole source of expected assistance in any remarketing effort of petitioner at the termination of the Owner Lease. [20] Our determination to factor the 20-percent commission due to Finalco in our objective analysis is indeed appropriate. James v. Commissioner,87 T.C. at 923 n. 4. *724 The Remarketing Agreement provided that Finalco receive a ten percent fee for any remarketing service. Pursuant to the Residual Revenue Agreement, Finalco was entitled to 20 percent of all Residual Revenue received for the sale or re-lease of the Equipment after petitioner received 120 percent of Net Equity as reduced by any cumulative cash flow. According to Olmstead, the remarketing provisions required Finalco to perform such services to be entitled to the 20-percent compensation. Petitioner argues that, as owner of the Equipment, he may select any individual or entity other than Finalco to remarket the Equipment. In Rice Toyota World, Inc., Finalco retained a 30-percent interest in any revenue generated either through sale or re-leasing of the equipment irrespective as to whether Finalco actually performed any remarketing services. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 195. [21] Notwithstanding the terms which indicate that Finalco must remarket the Equipment to be entitled to a remarketing fee or the 20-percent Residual Revenue, we find that petitioner intended to rely on Finalco for such services and that the substance of the transaction *725 is that petitioner must rely on Finalco to remarket the Equipment.
Petitioner lacks experience and resources to remarket the Equipment without assistance. We believe that petitioner as individual owner of peripheral computer equipment such as the Equipment must rely on any remarketing or residual revenue to be generated by Finalco. Based on our determinations as to Interim Revenue, residual value, and the interests of Finalco, we determine that the transaction was structured as tax-avoidance scheme devoid of economic substance and must be disregarded for Federal income tax purposes. [22]
*726 In Rice's Toyota World, Inc., the Court of Appeals for the Fourth Circuit held that a sham determination did not preclude the deduction of interest paid on a recourse installment note. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96. In Rose v. Commissioner,88 T.C. 386, 423 (1987), we adopted the view of the Court of Appeals for the Fourth Circuit. Consequently, petitioner is entitled to deduct interest paid on the Recourse Note. However, petitioner incurred no interest expense on the Recourse Note during the year 1980. By amendment to answer, respondent asserts the increased rate of interest provisions of section 6621(c) attributable to tax-motivated transactions. Respondent bears the burden of proof. Rule 142(a); Rose v. Commissioner, supra;Zirker v. Commissioner,87 T.C. 970 (1986). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate determined under section 6621(b) where there is a substantial underpayment in any taxable year attributable to one or more tax-motivated transactions. A substantial underpayment exists where such underpayment attributable to a tax-motivated *727 transaction exceeds $ 1,000. Sec. 6621(c)(2. Section 6621(c) is applicable solely with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent asserts the provisions of section 6621(c) are applicable because the transaction at issue is defined as tax-motivated transactions where losses are disallowed by reason of section 465(a). Sec. 6621(c)(3)(A)(ii). We have determined that the transaction was a tax-motivated scheme devoid of economic substance. Section 6621(c)(3)(A)(v) added by Congress specifically includes within the definition of tax-motivated transactions "any sham or fraudulent transaction." [23] We have previously determined that "any sham or fraudulent transaction" within the meaning of section 6621(c)(3)(A)(v) includes a transaction which lacked subject profit motive and which was without economic substance. Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987). We have recently determined that *728 the presence of profit motive does not preclude the determination that a transaction lacks economic substance and is, therefore, an economic sham. Cherin v. Commissioner, 89 T.C.    (Nov. 23, 1987). In this case, we determined that petitioner did not manifest a subjective profit motive and that the transaction was not supported with economic substance. Consequently, petitioner is liable for additional interest on the substantial underpayment of tax attributable to a tax-motivated transaction within the meaning of section 6621(c)(3)(A)(v) where we have determined the Equipment transaction to be a sham or fraudulent transaction. Decision will be entered under Rule 155.
Footnotes
1. Petitioner Shirley L. Moore did not appear at trial and no reference exists within the record concerning her involvement in the transactions at issue other than as signatory to the documents. Unless otherwise specified, petitioner shall refer only to petitioner Lewis W. Moore. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in question. All rule references are to the Tax Court Rules of Practices and Procedure. ↩
3. Former sec. 6621(d) has been redesignated as sec. 6621(c) pursuant to sec. 1511(c), Tax Reform act of 1986, 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. ↩
4. Peripheral computer equipment feeds information into and out of the central processing unit. The central processing unit, sometimes referred to as mainframe equipment, actually performs the data processing functions. ↩
5. The use of such terms as "purchase," "lease" and other like words does not imply that we consider the underlying transaction to be a fact construed as a "purchase" or "lease" for Federal income tax purposes. We probe beyond the labels given by the parties to determine whether an actual economic investment existed. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 210 (1983), affd. on this ground 752 F.2d 89↩ (4th Cir. 1985). 6. The Computer Price Guide is a quarterly journal published by Computer Merchants, Inc. The Computer Price Guide was the computer industry's first regularly published source of price and market information for both new and used computer equipment and is widely relied upon in the industry. See Mukerji v. Commissioner,87 T.C. 926, 946-947↩ (1986). 7. The record indicates that much confusion has existed as to the actual peripheral items contained in the Canteen Equipment as purchased by petitioner. The Comdisco Canteen Purchase Agreement between Comdisco and Blackwood correctly set forth the items of the Canteen Equipment. At some point in time, Finalco attached an incorrect equipment schedule to the Finalco Purchase Agreement between Finalco and Lease Pro regarding the ultimate sale to petitioner. The incorrect equipment included by Finalco to Lease Pro identified the following IBM peripheral equipment: Quantity
Equipment
Description
1
3340-A2
Direct Access Storage
Facility  1
3340-B2
Direct Access Storage
Facility  The Comdisco Purchase Agreement set the fair market value of the incorrect equipment to be $ 41,798. By amendment back dated to December 1, 1980, Finalco attempted to correct the inaccuracy in the equipment schedule. However, Finalco incorrectly amended the pertinent agreements among Finalco, Lease Pro, and petitioner to indicate that the Canteen Equipment included five units of the IBM 3420-7 Magnetic Tape Units rather than the three units of the IBM 3420-7 Magnetic Tape Unit in fact purchased. It is not clear as to the point in time that the parties learned that the Canteen Equipment in fact included only the three magnetic tape units. Morgan valued the Canteen Equipment to include five of such units. We have adjusted her determinations purely on a mathematical basis. Lyons submitted two expert reports covering each scenario. Such inconsistency is further evidence of the ambivalence to accuracy and attention to detail in the documentation of these transactions as indicated by the administrative practices of Finalco. See also Sturm v. Commissioner,T.C. Memo. 1987-625↩. 8. The separately stated dollar value of each machine type does not agree to the cumulative eight-year residual value of the Alcoa equipment indicated within Lyons report. ↩
9. We have adjusted Morgan's report figures. Morgan valued five magnetic tape units rather than the acquired three units included in the Canteen Equipment. Morgan's calculations of the Alcoa Equipment Blue Book value contained a mathematical error. See footnote 7, supra.↩
10. The companion cases are: Larsen v. Commissioner, 89 T.C.   (1987); Sturm v. Commissioner,T.C. Memo. 1987-625; Shriver v. Commissioner,T.C. Memo. 1987-627; Casebeer v. Commissioner,T.C. Memo. 1987-628↩. 11. Carlson v. Commissioner,T.C. Memo. 1987-306↩. 12. The presence of business purpose does not entitle a business transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. Cherin v. Commissioner,↩ 89 T.C.    (Nov. 23, 1987). 13. Dobbs v. Commissioner,T.C. Memo. 1987-361; Kaufman v. Commissioner,T.C. Memo 1987-350↩. 14. Although not material to our determination of economic substance, we are impelled to find that Lease Pro served no legitimate business purpose in the transaction and was inserted into the chain of title by Finalco solely for tax considerations. See Bussing v. Commissioner,88 T.C. 449 (1987), Supplemental Opinion 89 T.C.   (filed Nov. 24, 1987); Coleman v. Commissioner,87 T.C. 178, 206 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987); Tolwinsky v. Commissioner,86 T.C. 1009↩ (1986). 15. Compare the companion case Larsen v. Commissioner,↩ 89 T.C.    (1987). 16. The Canteen Equipment allocation of $ 54,135 is the amount represented in the Comdisco Purchase Agreement as the fair market value. ↩
17. ↩
Equipment
Percent of
Transaction
Range of Value
IBM List
Alcoa
$ 45,000 - $ 70,000
10 - 15 percent
Canteen
$ 10,000 - $ 13,000
10 - 13 percent
18. In Estate of Thomas v. Commissioner,84 T.C. 412 (1985), the parties stipulated that the equipment would at least retain 14 percent residual value at the end of the lease terms and that the equipment would retain three years of useful life at the termination of the lease term. The instant case presents facts in contrast to those presented in Estate of Thomas. See also Gefen v. Commissioner87 T.C. 1471, 1492↩ (1986). 19. Morgan determined the residual value of the Equipment in December of 1986 to be the amount of $ 16,500. We assume that petitioner may expect to receive a pro rata one-half of such amount as Interim Revenue during the Owner Lease, the amount of $ 8,250. ↩
20. Based on our review of the record, we determine that the interest of Comdisco in the Equipment pursuant to the Comdisco Management and Remarketing Agreement was intended to provide a benefit to Comdisco where the End Users executed a renewal of the End User Lease. Comdisco located the End Users and installed the Equipment. The End User aspects of the transaction were complete as of the date of transfer to Finalco through Blackwood. The Alcoa Lease is a triple net 24-month lease to terminate in December of 1981 without an option to purchase. The Canteen Lease was a triple net 39-month lease to terminate in November of 1983 without option to purchase. The Comdisco Management and Remarketing Agreement was to terminate in December 30, 1986, at which time either Comdisco or petitioner as owner may terminate upon 30 days notice. The Owner Lease was a 96-month lease to terminate in December of 1988. We are persuaded that Comdisco required the Comdisco Management and Remarketing Agreement as a condition of sale to Finalco. Phillip Hewes, the Comdisco staff attorney who drafted the Comdisco Management and Remarketing Agreement, provided no testimony as to whether Comdisco intended to solicit offers on behalf of petitioner other than from the End User. Our conclusion is that Comdisco intended to benefit solely from any sale or re-lease of the Equipment to the End Users immediately upon termination of the End User Leases. If the Equipment remained on lease through Comdisco in December of 1986, Comdisco would retain an interest in remarketing the Equipment with the End User. In our view, Comdisco did not realistically expect the End Users to continue to lease the Equipment until December of 1986. We are certain that Comdisco had no interest in dealing with petitioner where the Equipment was no longer on lease with the End User… The Comdisco Management and Remarketing Agreement provided Comdisco an exchange option. We assume any such exchange benefited Comdisco not petitioner. We find no evidence that petitioner as the owner of the Equipment was able to select the most competitive offer between Comdisco and Finalco or any other remarketing source as petitioner asserts. Notwithstanding the testimony of Olmstead, the remarketing terms of the Purchase Agreement are not clear as to whether Finalco is entitled to remarketing compensation concerning "renewals under the lease" or "referral of a willing buyer or seller" where the End User renewed the Equipment during the term of the Comdisco Management and Remarketing Agreement. We note that as to petitioner, Finalco delivered the End Users not Comdisco. ↩
21. The terms and effect of the Remarketing Agreement and Residual Sharing Agreement retained by Finalco in the instant case are in substance not materially different than the residual interest retained in Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part, revd. in part 752 F.2d 89↩ (4th Cir. 1985). 22. ↩
Net Equity:
Cash     $ 10,000 Recourse Note     67,700 Less Interim Revenue     8,250 Less Cash Flow     8,381 120 percent times      61,069  Net Equity     $ 73,283 Residual Value:
Alcoa     $ 45,000 Canteen     10,000 Petitioner     $ 55,000 Finalco     -0- $ 55,000 Economic Profit:
Cash flow     $ 8,381 Interim Revenue     8,250 Residual Revenue     55,000 Less Remarketing Fee - 10 percent     ( 5,500)
$ 66,131 Petitioner Investment:
Cash     $ 10,000 Recourse Note     67,700 Interest on Recourse Note     22,136 $ 99,836 23. Pub. L. 99-514, sec.1535(a), 100 Stat. 2085, 2750. ↩